## ALBERT F. FERGUSON v. DEPARTMENT OF EMPLOYMENT SERVICES.

247 N. W. 2d 895.

November 5, 1976—No. 45745.

*Richard J. Fuller*, Legal Aid Society of Minneapolis, for relator.

*Warren Spannaus*, Attorney General, *Peter W. Sipkins*, Solicitor General, *Peter C. Andrews*, Assistant Attorney General, and

*Louis K. Robards,* Special Assistant Attorney General, for respondent Department of Employment Services.

Considered and decided by the court without oral argument.

OTIS, JUSTICE.

This matter is before the court to review a decision of the commissioner of employment services finding that relator, Albert F. Ferguson, voluntarily discontinued his employment with Northwest Publications, Inc., and that his unemployment benefits were accordingly subject to the disqualifications set forth in Minn. St. 1974, § 268.09, subd. 1(1)(b).[1] Two issues are raised: First, whether the evidence supports a finding that relator voluntarily discontinued his employment, as to which we reverse; and second, whether relator had reasonable grounds for the apprehension he expressed concerning the safety of his working conditions, as to which we remand for additional findings.

---

[1] Minn. St. 1974, § 268.09, subd. 1(1)(b), provides: "An individual shall be disqualified for benefits:

"(1) If such individual voluntarily and without good cause attributable to the employer discontinued his employment with such employer or was discharged for misconduct, not amounting to gross misconduct, connected with his work or for misconduct which interferes with and adversely affects his employment, if so found by the commissioner, for not less than five nor more than eight weeks of unemployment in addition to and following the waiting period, or was discharged for gross misconduct connected with his work or gross misconduct which interferes with and adversely affects his employment, if so found by the commissioner, for 12 weeks of unemployment in addition to and following the waiting period, which disqualification shall not be removed by subsequent employment, and provided further that the commissioner is empowered to impose a total disqualification for the benefit year and to cancel part or all of the wage credits from the last employer from whom he was discharged for gross misconduct connected with his work, and the maximum benefit amount payable to such individual shall be reduced as follows:

\* \* \* \* \*

"(b) by an amount equal to two times the weekly benefit amount, when the separation occurs because of a voluntary separation as described in this clause."

1. The relator was employed as a printer by Northwest Publications, Inc. on October 13, 1973, when the events out of which this claim arose occurred. When he reported for work that afternoon, he was assigned by the foreman, Lawrence Zschokke, to punch tape in the "TPS" room. This was not his regular area of work and he refused to accept the assignment because one of the doors to the room had been nailed shut and the handles taken off on the previous day, and relator regarded the area as a firetrap.

The foreman's version of what occurred thereafter was as follows:

"At that time Mr. Ferguson said, I refuse to work in here. Put me some place else. I will not work in here, but I'll work any place else. And I says, you will not work any place else. I said, he is told to punch the tape for the third time, and I said, he was told to punch tape, and I says, either he goes and punches tape, or he leaves. He's through. And I told the chairman. He says, I will not go back to work. And I says, to the chairman, Mr. Verbout, I said, he's through. He'd better leave. At which time he did."

The foreman conceded that relator had the ability to work in a number of other places in the shop but testified he was needed that night in the TPS room. James Robertson, the production manager of the company, testified that relator's refusal to work in the TPS room was *not* misconduct.

The findings of the claims deputy, A. C. Wartinbee, on November 8, 1973, are as follows:

"The claimant was discharged from this employment on 10-13-73 for either misconduct or gross misconduct which was connected with his work or which interferes with and adversely affects his employment and is disqualified as indicated below.
                    "Misconduct
"1. (X) The claimant is disqualified for 5 weeks of unemployment in addition to and following the waiting period, and the maximum benefit amount otherwise payable

to him is reduced by 5 times his weekly benefit amount.

\* \* \* \* \*

"Findings of the Claims Deputy:

"The claimant was discharged from this employment for failing to do his assigned work because he felt the area was unsafe.

The claimant's allegation that the area was unsafe has not been substantiated."

A decision of an appeal tribunal of the Department of Manpower Services (which was subsequently set aside for lack of a record) found that relator was involuntarily separated for reasons other than misconduct. The second appeal tribunal found that he had voluntarily discontinued his employment. The commissioner of employment services approved and adopted the findings of the second tribunal.

The respondent Department of Manpower Services argues here that where an employee is discharged for refusing to obey an employer's orders it constitutes a voluntary termination within the meaning of Minn. St. 1974, § 268.09, subd. 1.[2] We do not agree. There is no evidence whatever to support such a finding by either the second appeal tribunal in its decision of October 3, 1974, or by the commissioner in adopting that tribunal's findings on February 27, 1975. Where, as here, the employee has reported for work and has stated his willingness to be assigned to duties for which he is qualified, and is thereupon discharged for refusing to remain in an area which he believes to be unsafe, we hold that he has not voluntarily terminated his employment.[3]

2. The only issue which remains is whether relator was dis-

---

[2] In re Karman, 2 App. Div. 2d 626, 151 N. Y. S. 2d 817 (1956), In re Caruso, 16 App. Div. 2d 1008, 229 N. Y. S. 2d 271 (1962), In re Rodrigues, 16 App. Div. 2d 1003, 229 N. Y. S. 2d 270 (1962).

[3] Minn. St. 268.09, subd. 1(4)(a), imposes on the commissioner the duty of considering "the degree of risk involved to [an individual's] health, safety, and morals" in determining whether prospective employment is suitable for such individual.

charged for misconduct within the meaning of § 268.09, subd. 1. The resolution of that issue on remand will depend on a determination of whether or not it was reasonable for relator to believe he had valid grounds for concern over his personal safety, not whether in the opinion of others his work area was safe for occupancy.

Relator testified that the shop steward and other fellow workers objected to the door being sealed and considered the area dangerous. Norman Hamink, secretary-treasurer of the union, corroborated relator in testifying that two or three people had complained about the door being nailed shut, that open gasoline cans were stored within 20 feet of the TPS room, and that smoking was allowed in the area.

There was testimony by Bradley Verbout, a printer and union acting chairman, that 15 employees had complained to him about the fire hazard.

The decision of the second appeal tribunal reversed the claims deputy on the issue of whether respondent was discharged, but went on to hold as follows:

"(2)    On October 13, 1973, the claimant was assigned to work in a room which the claimant considered to be unsafe. He refused to work in the assigned room and thereby voluntarily discontinued his employment.

\* \* \* \* \*

"\* \* \* Having considered all of the evidence presented at the hearing, the majority of the tribunal members conclude that the claimant has failed to prove that his assigned work area was so unsafe as to provide good cause attributable to the employer for voluntarily discontinuing his employment."

In a dissenting opinion, one member of the appeal tribunal stated, among other things:

"\* \* \* In this particular situation the claimant had the courage to express a view which was supported by many of his fellow employees \* \* \*.

"* * * [I]n my opinion, the decision of whether or not a given situation is a fire hazard becomes moot when the overwhelming majority of the employees of the employer concur in their fears about the situation. * * * The claimant established beyond a reasonable doubt that there were unalleviated fears in the minds of the employer's employees as to the safety of their working conditions."

On February 27, 1975, the commissioner adopted the findings and decision of the appeal tribunal.

One of the respondent's exhibits offered and received by the second appeal tribunal was the prior appeal tribunal's decision which had been set aside for lack of a record. That decision, dated December 7, 1973, reflects the opinion of those who previously heard the testimony:

"* * * [C]laimant was discharged from his employment, it being alleged that he refused to work at his assigned work station because he deemed it hazardous as a potential fire trap.

"(3)   A previously used exit door was nailed shut by the employer and the handles removed, and a machine placed in front of the said door.

* * * * *

"The sworn testimony adduced at the hearing from the claimant was in some conflict with the employer's exhibits concerning inspection of the work area by the St. Paul Fire Department and The Safety and Health Division of the Minnesota Department of Labor and Industry. It was stated by the claimant, unequivocally, that flammable gasoline was present in the work area, and very near the exits from the work area.

"Eight sworn affidavits were presented by the claimant from fellow employees which stated that the work area involved was, in fact, a potential safety hazard. Some substantial changes of a partial blocking of the remaining two exit doors was made subsequent to the complaint by the claimant.

"There was no conflict over the claimant's refusal to work in the area which he considered to be so unsafe as to amount to a

clear and present danger to his and other employees' welfare.

"The method used by the employer in resolving the dispute was the most drastic available, and the tribunal concludes that the employer had available to him far less drastic measures which he failed to use. Accordingly, the further conclusion of the tribunal is that the claimant's conduct did not evince a willful or wanton disregard of his employer's interests or demonstrate a lack of concern by the employee for his job.

"It is axiomatic that the party who advances the contention that a separation from employment was the result of misconduct must bear the burden of proving such misconduct. Applying the standards set forth, the tribunal concludes that the employer has not sustained that burden and such proof of misconduct is lacking here.

"DECISION: The claimant was involuntarily separated on October 13, 1973 from his employment for reasons other than misconduct; he is not disqualified for benefits; his maximum benefit amount is not reduced because of said separation from employment; and benefits paid, if any, to the claimant shall be charged to the employer's experience rating account."

In addition to the fact that one of three doors in the TPS room had been nailed shut and the doorknobs removed the day before relator was discharged, there was testimony by relator, corroborated by other employees, that the area was unsafe for additional reasons. The room to which relator was assigned was L-shaped and had an area of 848 square feet. One wall consisted of plywood. In addition to the door which had been nailed shut, there were two doors 22 feet apart at one end of the room. One of those doors was partially obstructed by a wooden baffle put there to keep out the draft. Gasoline in open cans and gasoline-soaked rags were stored within 20 feet of the exit doors. The windows in part of the area were unbreakable. The door which was nailed shut was the one closest to the fire escape. Plastics used in computer machines within the TPS room were highly

flammable. Smoking was allowed in the area where these combustibles were located.

The thrust of the commissioner's decision is found in this statement:

"Having considered all of the evidence presented at the hearing, the majority of the tribunal members conclude that the claimant has failed to prove that his assigned work area was so unsafe as to provide good cause attributable to the employer for voluntarily discontinuing his employment."

The fallacy in this holding, as we have noted, is the fact that it fails to determine whether or not at the time relator objected to working in the TPS room there was information available to him which made his refusal to work unreasonable. There was no evidence that relator on the night of October 13 was informed that the area had been examined by a fire inspector prior to that time. The only information then conveyed to relator was the fact that the permanent chairman of the union declared the room was "legal." Bradley Verbout who conveyed the foreman's conclusion to the relator later testified as follows:

"A. Well I thought there was a reasonable chance that there could be a fire, and it could trap people in there. That's a fire hazard. Right?

"Q. Would you tell us why you thought this?

"A. Well the door seemed awfully small they had there. They have another door around the corner. And there is a big linotype machine sitting there, and there's always something around that door. Got a copy cutter sitting up there on a chair in front of the door. Waste paper basket. Another puncher right off within a foot of the door. Be a little hard to get out of there if there is a fire in there.

"Q. What did they use to clean their machines?

"A. Clean the machines? Gas.

"Q. Have you ever been aware, and particularly on that evening, were there gasoline cans, rags, sitting around in the shop?

"A. Oh, yeah. There always is."

Not only was the fact of a prior inspection withheld from relator, but it was at best hearsay and failed to disclose the identity of the inspector or the date of the inspection.

On Sunday evening, October 14, 1973, at about 7:30 p. m. after these events occurred, a fire marshal, Walter Shimek, inspected the premises at the request of a union representative. That inspection occurred after relator had been discharged. The report said, among other things, that the exit from the TPS room "was probably adequate" and concluded "No cause for this complaint." The following Monday, October 15, a fire inspector, James Tucker, examined the premises and found no cause for complaint. On the 19th of October a third inspection was conducted by the Occupational Safety and Health Division of the Minnesota Department of Labor and Industry. That report indicated no gasoline or flammable material was in evidence at the time of the inspection and no citations were issued as a result of the inspection.

With respect to these inspections, three things are significant: First, three of the inspections were made after the fact and none of the conclusions expressed was available to relator on the afternoon of October 13 before he was discharged. Second, they do not purport to cover areas outside of the TPS room where several witnesses testified volatile materials were located. And third, if an inspection was made prior to October 13, it was at a time when the exit door complained of had not been sealed shut.

In Tilseth v. Midwest Lbr. Co. 295 Minn. 372, 374, 204 N. W. 2d 644, 646 (1973), we defined misconduct of a kind which justifies partial forfeiture of unemployment benefits under § 268.-09, subd. 1, by adopting the Wisconsin rule stated in Boynton Cab Co. v. Neubeck, 237 Wis. 249, 259, 296 N. W. 636, 640 (1940):

"* * * [T]he intended meaning of the term 'misconduct' * * * is limited to conduct evincing such wilful or wanton disregard of an employer's interests as is found in deliberate viola-

tions or disregard of standards of behavior which the employer has the right to expect of his employee, or in carelessness or negligence of such degree or recurrence as to manifest equal culpability, wrongful intent or evil design, or to show an intentional and substantial disregard of the employer's interests or of the employee's duties and obligations to his employer. On the other hand mere inefficiency, unsatisfactory conduct, failure in good performance as the result of inability or incapacity, inadvertencies or ordinary negligence in isolated instances, or good-faith errors in judgment or discretion are not to be deemed 'misconduct' * * *."

Upon remand the commissioner will reconsider relator's refusal to work in the TPS room by reference to the definition of misconduct we have adopted in the Tilseth case and our discussion of the cases which follow.[4]

The precedents for formulating an appropriate rule are limited but they reach substantially the same conclusions in defining the circumstances under which fear for one's own safety constitutes good cause for refusing to accept the employer's working conditions. Pennsylvania courts, in refusing benefits, approved these rules:

"* * * Conceivably, fear may constitute good cause, although we do not now decide that question. But certainly a groundless, unreasonable, a pathological or a phantasmal fear will not answer the requirements of good cause." Glen Alden Coal Co. v. Unemployment Comp. Bd. of Rev. 171 Pa. Super. 325, 328, 90 A. 2d 331, 333 (1952), quoting from Myers Unemployment Comp. Case, 164 Pa. Super. 150, 152, 63 A. 2d 371, 372 (1949).

"* * * There are hazards in every line of work, and we cannot accept unreasonable and unjustified fear of possible injury as a compelling and necessitous reason for leaving employment." Lirakis v. Unemployment Comp. Bd. of Rev. 194 Pa. Super. 342, 344, 168 A. 2d 647, 648 (1961).

---

[4] See, also, Annotation, 35 A. L. R. 3d 1129, 1160.

An Ohio court in Reeves v. Board of Rev. of Unemployment Comp. 52 Ohio O. 398, 118 N. E. 2d 159 (1953), held that an employee who had previously been assaulted was entitled to unemployment compensation when she refused to work on a shift that required her to walk through a dangerous area of the city after dark. There the court used as a test the question of whether the employee's reason for quitting was compelling, whether it was real and not imaginary, substantial and not trifling, reasonable and not whimsical or capricious. The court held that the circumstances described would cause a reasonable person to fear for her safety and that her refusal to work on a nighttime shift was bona fide.

The Court of Appeals of Alabama in Dwight Mfg. Co. v. Long, 36 Ala. App. 387, 56 So. 2d 685 (1952), dealt with an illiterate employee transferred from operating a coal furnace to one which burned gas. The new assignment required an understanding of the operation of the gas furnace, spelled out by printed operating instructions which the employee was unable to read. Under these circumstances he refused to accept the new assignment for fear it would result in the boiler exploding. The question before the court was whether the employee was entitled to unemployment benefits or whether he voluntarily left his job without good cause.[5] The court there said:

"* * * We think that 'good cause' in the law of instant concern connotes substantial reason; just ground for such action; adequate excuse that will bear the test of reason; and always the element of good faith.

\* \* \* \* \*

---

[5] A definition of good cause is summarized in 81 C. J. S., Social Security and Public Welfare, § 167, as follows: "In order to constitute good cause, the circumstances which compel the decision to leave employment must be real, not imaginary, substantial not trifling, and reasonable, not whimsical; there must be some compulsion produced by extraneous and necessitous circumstances. The standard of what constitutes good cause is the standard of reasonableness as applied to the average man or woman, and not to the supersensitive * * *."

"The fear of his inability to operate the gas burning furnaces may have been based on a false premise, but unquestionably the fear existed. To the claimant it was real not imaginary, substantial not whimsical." 36 Ala. App. 389, 56 So. 2d 686.

Applying the rules which emerge from the cases we have cited, we hold that relator has made a prima facie showing that on the afternoon of October 13, 1973, he had reasonable cause to fear for his own safety in refusing to occupy the TPS room which was not his usual area of work. However, that issue was not decided by the appeal tribunal or the commissioner. The issue litigated was whether relator's work area was *in fact* safe. The evidence bearing on that question is, of course, relevant to the issue to be resolved on remand only if all of the facts were available to, and known by, the relator at the time of his confrontation with the foreman. However, we do not suggest that the evidence in this record compels a finding that the conditions were safe, since it is not clear whether the inspectors considered all of the grounds for complaint which relator and other employees specified. Upon a rehearing, therefore, evidence both of the actual conditions which existed and relator's knowledge of them may be received. Whether or not there was good cause for relator's refusal to work in the TPS room may then be determined by the Department of Employment Services under the rules and precedents we have discussed as guidelines for arriving at the facts.

Reversed and remanded.