Donna Mae GONSIOR, Relator,

v.

ALTERNATIVE STAFFING,
INC., Respondent,

Commissioner of Jobs and
Training, Respondent.

No. C4–85–1199.

Court of Appeals of Minnesota.

July 8, 1986.

Review Denied Aug. 27, 1986.

Donna Mae Gonsior, pro se.

Frank J. Stangel (Unauthorized to Practice Law), for Donna Mae Gonsior.

Kevin Snell, Messerli & Kramer Law Offices, Minneapolis, for Alternative Staffing, Inc.

Hubert H. Humphrey, III, Atty. Gen., Peter C. Andrews, Sp. Asst. Atty. Gen., St. Paul, for Commissioner of Jobs and Training.

Considered and decided by POPOVICH, C.J., FORSBERG and RANDALL, JJ., with oral argument waived.

## OPINION

POPOVICH, Chief Judge.

Relator Donna Gonsior left her job with respondent Alternative Staffing, Inc. and applied for unemployment compensation benefits. Following a hearing, a department referee issued two separate decisions, finding Gonsior had voluntarily quit her job without good cause and had refused an offer of suitable reemployment. A Commissioner's representative affirmed the referee's decision, and Gonsior appealed by writ of certiorari. Pursuant to respondent Commissioner's motion, we discharged the writ as untimely served. Gonsior appealed to the supreme court, which reversed and remanded to this court for consideration of Gonsior's claims. *Gonsior v. Alternative Staffing, Inc.*, 383 N.W.2d 654 (Minn.1986). We affirm.

## FACTS

Donna Gonsior was employed by Alternative Staffing, Inc., a temporary staffing service, as a marketing representative and staffing coordinator from January 1983 to October 1984. Gonsior had previously worked at another company with the president and the sales manager of Alternative Staffing and a personal, as well as a business, relationship had developed between them.

When Gonsior was hired at Alternative Staffing, she entered into a written employment contract which indicated her salary would be $5.50 per hour for 40 hours each week, plus time and a half for overtime. The agreement also required Gonsior to comply with Alternative Staffing's policies and procedures. In December 1983, Gonsior was offered the choice of continuing to be paid on an hourly basis or receiving a straight salary. Gonsior chose to be paid on a straight salary basis, effective January 1, 1984.

In October 1983, Gonsior had surgery. Her insurance company paid its required share of the costs, but informed Gonsior if the surgery was work-related, the cost might be covered by workers' compensation. The insurance company therefore requested Gonsior to inform her agent or the office if a workers' compensation claim was filed and paid, so the insurance company could obtain reimbursement. Gonsior did not pursue the workers' compensation claim.

In December 1983, a former boyfriend of Gonsior, who was also a client of Alternative Staffing, came to the office and gave Gonsior a Christmas present. Although Gonsior alleges the president of Alternative Staffing coerced her into keeping the gift, the president testified she did not try to talk Gonsior into keeping it.

Prior to December 1983, Gonsior drove her own automobile and received a car allowance from Alternative Staffing. In late December 1983, Gonsior was given a company car and continued to receive 20 cents per mile for business use. In January 1984, Gonsior was informed she would have to claim the car's value as income for tax purposes or pay Alternative Staffing $50 per month for her personal use of the car. Gonsior chose to pay Alternative Staffing the $50 per month.

When Alternative Staffing first began providing health coverage for its employees, Gonsior's premium notices were sent directly to her home and were then submitted to Alternative Staffing for payment. Gonsior did not receive a premium notice in late March 1984 because she had moved, and the notice was returned to the health insurance carrier. When the president of Alternative Staffing did not receive Gonsior's billing, the health insurance carrier was requested to send all bills directly to Alternative Staffing. In June 1984, another billing was also inadvertently sent to Gonsior's address and was returned to the health insurance carrier. Once again, the address on the account was corrected, and Alternative Staffing paid the premium. Gonsior was never without health insurance during that period of time.

Prior to spring 1984, Alternative Staffing did not have its own account with a local florist and, instead, charged purchases to Gonsior's personal account. Gonsior had consented to this arrangement and was always reimbursed. After Alternative Staffing obtained its own corporate account, a purchase by Alternative Staffing was erroneously charged to Gonsior's account. When Gonsior notified Alternative Staffing of the error, she was reimbursed.

In spring 1984, Gonsior moved in with a friend and became involved with his business and personal affairs, including a custody battle regarding his son. Gonsior ran errands or performed other tasks for her friend during working hours, and on one or more occasions she was assisted by the president and/or the sales manager.

During this same period of time, the president and sales manager began to notice a change in Gonsior's attitude and behavior. Although her job performance had previously been superior, her productivity and service to clients began to slip, and the number of errors in her paperwork increased. She became edgy and disrespectful, and would on occasion snap at other employees. During summer 1984, the sales manager met with Gonsior several times to discuss her behavior and job performance.

In September 1984, Gonsior was allegedly assaulted on Alternative Staffing's premises by the former boyfriend/client of Alternative Staffing. She filed a criminal complaint against the former boyfriend and, at the request of the former boyfriend's attorney, the president and office manager of Alternative Staffing signed affidavits setting forth their knowledge of the incident. They also gave statements to the police. Gonsior was upset by these statements, believing the president and office manager should have sided with her.

On October 25, 1984, the president and the sales manager met with Gonsior to again discuss her deteriorating job performance and attitude. On the previous day, Gonsior had ignored a business call to continue a personal call instead. At the October 25 meeting, Gonsior was informed she needed to make a real commitment to her work and should keep her personal business out of the office.

The following morning, the president again met with Gonsior and asked her if she intended to make a commitment to the company. Gonsior indicated the extent of her dedication would depend upon the outcome of her friend's custody suit. The president then informed Gonsior she could

not continue to take care of personal tasks on company time. Gonsior denied doing so in the past, but also refused to promise not to continue. The president, as a punitive measure, revoked a period of vacation which Gonsior had previously been granted.

That evening, the sales manager met with Gonsior and asked for her office key because the number of keys were limited, the sales manager needed one, and Gonsior did not need hers. At that time, the sales manager expressed concern over Gonsior's attitude, and informed her again that her vacation was cancelled. Gonsior ended the conversation by telling the sales manager she had a dinner engagement with her parents. A few minutes later, Gonsior asked if the sales manager wanted her separation notice. The sales manager asked Gonsior if that was really what she wanted, or if she wanted a week off to think about it, since she believed Gonsior was making a mistake. Gonsior replied if she was making a mistake, the sales manager would be the first to know, and gave the sales manager her garage pass card and all of her keys, including her company car keys. The sales manager helped Gonsior move her personal belongings, and said her job would always be there if she changed her mind.

On November 16, 1984, the president of Alternative Staffing called Gonsior and offered her job back under the same terms and conditions. Gonsior responded she had nothing to say, and hung up the telephone.

## ISSUES

1. Should this matter be dismissed because Gonsior is represented by a non-attorney?

2. Did Gonsior voluntarily quit her job at Alternative Staffing without good cause, or was she discharged?

3. Did Gonsior refuse an offer of suitable reemployment?

4. Did Gonsior engage in disqualifying misconduct?

5. Should this court strike certain allegations and references from the record?

## ANALYSIS

■ 1. We must first decide whether this matter may proceed in this court. Throughout the proceedings below, Gonsior was represented by her boyfriend, a non-attorney, who continues to act as her counsel even in this court. Minn.Stat. § 268.10, subd. 9 (1984) states in part:

Any individual claiming benefits in any proceedings before the commissioner [of Jobs and Training] or his representatives or a court may be represented by counsel or other duly authorized agent, *except that said agent in any court proceedings under these sections, must be an attorney at law * * *.*

(Emphasis added.) In addition, the legislature has specifically stated:

It shall be unlawful for any person or association of persons, except members of the bar of Minnesota admitted and licensed to practice as attorneys at law, to appear as attorney or counselor at law in any action or proceeding in any court in this state to maintain, conduct, or defend the same, except in his own behalf as a party thereto in other than a representative capacity * * *.

Minn.Stat. § 481.02, subd. 1 (1984). Unauthorized practice of law is also prohibited by the Minnesota Rules of Professional Conduct.

Some jurisdictions have dismissed actions where a party has retained a non-attorney to pursue an appeal. *See, e.g., Ebeling v. Continental Illinois National Bank & Trust Company of Chicago,* 272 Cal. App.2d 724, 77 Cal.Rptr. 612, 613 (1969); *see also Midwest Home Savings & Loan Association v. Ridgewood, Inc.,* 123 Ill. App.3d 1001, 79 Ill.Dec. 355, 358, 463 N.E.2d 909, 912 (1984) (secretary of corporation could not pursue an appeal without retaining an attorney; "[a]n opposite conclusion would condone the unauthorized practice of law by a corporate litigant through layman agents"). Many courts have also held a proceeding in an action by

a non-attorney is a nullity, and if appropriate and timely steps are taken, the suit may be dismissed, the judgment reversed, or the actions of the non-attorney disregarded. *See McKenzie v. Burris*, 255 Ark. 330, 500 S.W.2d 357, 360 (1973); *Janiczek v. Dover Management Co.*, 134 Ill. App.3d 543, 89 Ill.Dec. 673, 674, 481 N.E.2d 25, 26 (1985); 7 C.J.S. *Attorney and Client* § 31 (1980). Although we note dismissal of proceedings commenced by a non-lawyer is a "drastic remedy," *Niklaus v. Abel Construction Co.*, 164 Neb. 842, 83 N.W.2d 904, 911 (1957), the purpose of the rule is to protect the public. *Gardner v. Conway*, 234 Minn. 468, 481, 48 N.W.2d 788, 796 (1951). Thus, one court reversed the dismissal of an action where an attorney was disbarred after he had filed a party's complaint, since the party never "consciously elected to be represented by a layman." *Janiczek*, 89 Ill.Dec. at 675, 481 N.E.2d at 27. In the present situation, however, Gonsior *has* consciously chosen to be represented by a non-attorney, and we believe dismissal would not be unduly harsh.

Ordinarily, therefore, we would dismiss Gonsior's appeal due to her representation by a non-attorney. However, we note the issue of Gonsior's representation by a non-attorney was previously raised in the Commissioner's memorandum to the supreme court when Gonsior appealed this court's discharge of her writ. The supreme court did not dismiss Gonsior's appeal due to her representation by a non-attorney, and we must be guided by the supreme court's actions in this instance. However, in the future we will enforce the legislative directives, prevent the unauthorized practice of law, and dismiss appeals brought by non-lawyers.

■ 2. The Commissioner's representative determined Gonsior voluntarily quit her position. Whether an employee quit or was discharged is a question of fact. *Hollar v. Richard Manufacturing Co.*, 346 N.W.2d 692, 694 (Minn.Ct.App.1984). Our review is limited to determining whether there is evidence in the record which reasonably tends to support the Commissioner's findings. *White v. Metropolitan Medical Center*, 332 N.W.2d 25, 26 (Minn. 1983).

There is substantial evidence here to support the Commissioner's finding Gonsior voluntarily quit her job with Alternative Staffing. The president and the sales manager both testified they never intended to discharge Gonsior. The sales manager also testified she asked Gonsior if she wanted a week off to think about her decision and told Gonsior her job would be available if she changed her mind. The circumstances viewed in their entirety support the Commissioner's determination it was Gonsior's decision to sever the employment relationship.

■ An employee's reasonable belief she has been fired does not constitute a voluntary termination of employment. *Midland Electric, Inc. v. Johnson*, 372 N.W.2d 810, 812 (Minn.Ct.App.1985). Here, however, Gonsior's claim she believed she had been discharged is not reasonable under the circumstances.

■ Gonsior also claims she had good cause for leaving her position based upon several complaints about her working conditions. The Commissioner's representative determined, however, that Gonsior's complaints did not constitute good cause to quit. "Good cause" is determined by reference to the average reasonable person, rather than the supersensitive. *Ferguson v. Department of Employment Services*, 311 Minn. 34, 44 n. 5, 247 N.W.2d 895, 900 n. 5 (1976). The test is "whether the employee's reason for quitting was compelling, whether it was real and not imaginary, substantial and not trifling, reasonable and not whimsical or capricious." *Id.* at 44, 247 N.W.2d at 900.

■ We agree with the Commissioner's determination Gonsior did not have good cause to quit. For each of her charges, respondent had a very plausible explanation. The record as a whole indicates Gonsior was simply unhappy with her job, wanted to spend time doing her boyfriend's business at work, wanted a free car and

took advantage of her employers, who were willing to keep trying to improve the working conditions.

3. Respondent's president telephoned Gonsior shortly after she quit to offer her old position back with the same salary, benefits and conditions. Gonsior's claim this offer was coerced by the claims deputy for the Department of Jobs and Training is unrealistic and unbelievable since Gonsior was informed when she left she could come back at any time.

■ Gonsior also claims she held the telephone away from her ear and did not hear the offer of reemployment. While the employer has the burden of proving that a definite and express offer of suitable reemployment was made, *LaSalle Cartage Co., Inc. v. Hampton*, 362 N.W.2d 337, 341 (Minn.Ct.App.1985); *Larson v. Pelican Lake Nursing Home*, 353 N.W.2d 647, 649 (Minn.Ct.App.1984), the record here clearly indicates the offer was made.

■ 4. Although Gonsior discusses misconduct at length, there has been no allegation of misconduct by the employer. Neither the referee nor the Commissioner addressed that issue, and neither will we.

■ 5. Gonsior asks this court to strike all allegations of misconduct and certain other references. Minn.R.Civ.App.P. 110.-01 provides:

> The papers filed in the trial court, the exhibits, and the transcript of the proceedings, if any, shall constitute the record on appeal in all cases.

*Id.* There was no objection at the hearing, and Gonsior's "attorney" himself questioned Gonsior about the disputed references. Absent compelling circumstances, not demonstrated here, the record will remain as it has been transcribed.

## DECISION

The Commissioner's decision determining relator voluntarily quit without good cause is affirmed.

Affirmed.