*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2012).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A13-1806**

Charles Lambert Bey,
Relator,

vs.

W.W. Johnson Meat Co., Inc.,
Respondent,

Department of Employment and Economic Development,
Respondent.

**Filed July 21, 2014
Affirmed
Peterson, Judge**

Department of Employment and Economic Development
File No. 31227896-3

Charles Lambert Bey, Apple Valley, Minnesota (pro se relator)

W. W. Johnson Meat Co., Inc., Minneapolis, Minnesota (respondent employer)

Christine E. Hinrichs, Bassford Remele, Minneapolis, Minnesota (for respondent department)

        Considered and decided by Peterson, Presiding Judge; Schellhas, Judge; and Connolly, Judge.

**PETERSON**, Judge

Pro se relator seeks certiorari review of an unemployment-law judge's decision that he is ineligible to receive unemployment benefits because he quit his employment without good reason caused by his employer. We affirm.

**FACTS**

Relator Charles Bey worked for respondent W.W. Johnson Meat Co. Inc. from December 12, 2005, to April 26, 2013. During his employment, there were three incidents involving relator and the plant manager, Gary Bjornberg, that relator argues led him to quit his employment.

In the first incident, which occurred in June 2011, Bjornberg encountered relator, who is an American of Moroccan descent, and another worker who, according to relator, is a "Puerto Rican Native American," in the break room and said, "[H]ey boys, how is it going out there[?]" Relator felt that Bjornberg's use of the word "boy" was dehumanizing, disrespectful, and racist. Relator did not report the incident, and Bjornberg never again used "boy" to refer to relator.

In the second incident, which occurred in September 2011, relator was sitting in the lunchroom with other workers, and as Bjornberg walked through the lunchroom he "rubbed" relator "on [his] head." Relator went immediately to speak with the company CEO, Tom Raschadi, but Raschadi was not in the office, and relator did not speak to him until a month later. At that time, Raschadi said that he would talk to Bjornberg, possibly send him for training, and, if that did not work, go from there.

In the third incident, Bjornberg called a meeting with production-line employees on April 19, 2013, to talk about product mislabeling that occurred on their line. During the meeting, as Bjornberg was talking about how products could not be sent out mislabeled, he turned and "pointed directly in [relator's] face," almost touching relator.[1] At lunch that day, relator complained to Bjornberg, who told him that he took things too seriously and was overreacting, and demonstrated that he could point in his own face and relator's face, and said, "[L]isten, you know I can point in anybody's face." In response, relator told Bjornberg, "[T]his right here is too hostile for me," gave Bjornberg one week's notice, and went to the office of human-resources manager, Karen Rathburn, to report what had happened, repeating that he wanted to quit at the end of the following week. Relator hoped that the incident could be resolved, but the company accepted his resignation.

Relator applied for unemployment benefits, and he was found ineligible. He sought review in a hearing before an unemployment-law judge (ULJ). The ULJ heard testimony primarily from relator, Bjornberg, and Rathburn. During his testimony, Bjornberg denied that he had called relator a "boy" but did admit that he said "come on boys let's go" to a group of employees. He also denied rubbing relator's head and said he

---

[1] Relator asserts that Bjornberg's finger pointing constituted criminal assault. But, in the criminal code, "assault" is defined as "(1) an act done with intent to cause fear in another of immediate bodily harm or death; or (2) the intentional infliction of or attempt to inflict bodily harm upon another." Minn. Stat. § 609.02, subd. 10 (2012). "Bodily harm" is defined as "physical pain or injury, illness, or any impairment of physical condition." Minn. Stat. § 609.02, subd. 7 (2012). Finger pointing, without some further conduct, likely did not constitute an assault.

merely tapped relator on his head to signify a "pat on the back." Bjornberg testified that when he learned that relator was offended by the first two incidents, he apologized to relator. Bjornberg admitted that during the April 2013 meeting he pointed at the employees and said, "[G]uys[,] we have to use our eyes, we have to look at these labels cause we were sending out product with the wrong label[s] on them."

Rathburn testified that relator came to speak with her several times over the years to discuss various incidents, sometimes a significant period of time after the incidents occurred. With regard to the two incidents in 2011, the company required Bjornberg to receive further training. As to the final incident, Rathburn said that she conducted a thorough investigation and interviewed the three employees who were with relator and Bjornberg at the meeting. According to Rathburn, one of the employees did not remember Bjornberg pointing, and the other two said that Bjornberg was using the pointing gesture to remind them to be observant.

The ULJ found relator's testimony more credible than Rathburn's because "it was detailed, persuasive, and described a more plausible sequence of events" and because Rathburn's testimony was "hesitant" and inconsistent. But the ULJ, nevertheless, determined that relator quit his job, and he did not quit because of a good reason caused by his employer. The ULJ concluded that, although some of the incidents were culturally insensitive, most of the incidents occurred in 2011 and earlier and did not cause relator to quit, and the incidents would not have caused an average worker to quit. As to the final finger-pointing incident, the ULJ relied on Bjornberg's and Rathburn's testimony that Bjornberg pointed at other employees as well as relator and determined that Bjornberg's

4

conduct would not have prompted the average worker to quit and it was not likely that Bjornberg intended any disrespect. Relator requested reconsideration, and the ULJ affirmed. This certiorari appeal followed.

## D E C I S I O N

When reviewing the decision of a ULJ, this court may affirm the decision, remand the case for further proceedings, or reverse or modify the decision if the relator's substantial rights

> have been prejudiced because the findings, inferences, conclusion, or decision are:
> (1) in violation of constitutional provisions;
> (2) in excess of the statutory authority or jurisdiction of the department;
> (3) made upon unlawful procedure;
> (4) affected by other error of law;
> (5) unsupported by substantial evidence in view of the entire record as submitted; or
> (6) arbitrary or capricious.

Minn. Stat. § 268.105, subd. 7(d) (2012). This court reviews the ULJ's findings of fact in the light most favorable to the decision and will not disturb the findings if the record substantially supports them. *Stassen v. Lone Mountain Truck Leasing, LLC*, 814 N.W.2d 25, 31 (Minn. App. 2012). Credibility determinations are for the ULJ to make, *Skarhus v. Davanni's Inc.*, 721 N.W.2d 340, 344 (Minn. App. 2006) (stating that ULJ must make credibility determinations), and the unemployment statute requires the ULJ to enumerate the reasons for finding one witness more credible than another, Minn. Stat. § 268.105, subd. 1(c) (2012) (requiring ULJ to "set out the reason for crediting or discrediting . . . testimony" when credibility significantly impacts a decision).

5

"Whether an employee has been discharged or voluntarily quit is a question of fact. . . ." *Stassen*, 814 N.W.2d at 31. A quit occurs "when the decision to end the employment was, at the time the employment ended, the employee's." Minn. Stat. § 268.095, subd. 2(a) (2012). An applicant who quits employment is ineligible for unemployment benefits unless a statutory exception to ineligibility applies. Minn. Stat. § 268.095, subd. 1 (2012). An employee is eligible for benefits if the employee "quit the employment because of a good reason caused by the employer." *Id.* subd. 1(1) (2012). A good reason for quitting caused by the employer is a reason that:

> (1)  . . . is directly related to the employment and for which the employer is responsible;
>
> (2)  . . . is adverse to the worker; and
>
> (3)  . . . would compel an average, reasonable worker to quit and become unemployed rather than remaining in the employment.

*Id.*, subd. 3(a) (2012). "Good cause is a reason that is real, not imaginary, substantial not trifling, and reasonable, not whimsical; there must be some compulsion produced by extraneous and necessitous circumstances." *Haskins v. Choice Auto Rental, Inc.*, 558 N.W.2d 507, 511 (Minn. App. 1997) (quotation omitted). "The standard of what constitutes good cause is the standard of reasonableness as applied to the average man or woman, and not to the supersensitive." *Ferguson v. Dept. of Emp't Servs.*, 311 Minn. 34, 44 n.5, 247 N.W.2d 895, 900 n.5 (1976) (quotation omitted). On given facts, the question whether an employee had a good reason to quit is a question of law. *Edward v. Sentinel Mgmt. Co.*, 611 N.W.2d 366, 367 (Minn. App. 2000), *review denied* (Minn. Aug.

6

15, 2000). The employee's reason for quitting is a fact determination for the ULJ. *See Beyer v. Heavy Duty Air, Inc.*, 393 N.W.2d 380, 382 (Minn. App. 1986) (reviewing as factual finding ULJ's determination of reason for employee's quit).

Citing and relying nearly exclusively on federal law that is not related to Minnesota unemployment compensation, relator makes several arguments why his separation from employment was for a good reason caused by the employer. Relator asserts that he endured "a constant and continuous stream of abuse" from Bjornberg that was racially discriminatory and that individual acts constituted harassment or assault or created a hostile work environment.

"Illegal conduct by an employer may constitute good cause for an employee to quit." *Hawthorne v. Universal Studios, Inc.*, 432 N.W.2d 759, 762 (Minn. App. 1988). Racial discrimination has been recognized as a good cause for an employee to quit. *Marz v. Dept. of Emp't Servs.*, 256 N.W.2d 287, 289 (Minn. 1977). And harassment "may constitute good reason [for a quit] if the employer has notice and fails to take timely and appropriate measures to prevent harassment by a co-worker." *Nichols v. Reliant Eng'g & Mfg., Inc.*, 720 N.W.2d 590, 595 (Minn. App. 2006).

Relator did not object to the conduct in the first incident in 2011, and when Bjornberg learned that the first two incidents offended relator, he apologized to relator. More importantly, in spite of the first two incidents, relator continued working for respondent for almost two years, which supports the ULJ's finding that the incidents did not cause relator to quit his employment, as required to receive unemployment benefits. Minn. Stat. § 268.095, subd. 1(1) (requiring quit to be "caused" by the employer).

7

The final incident was, at most, inappropriate, rather than actionable discrimination or other actionable conduct. *See Portz v. Pipestone Skelgas*, 397 N.W.2d 12, 14 (Minn. App. 1986) (excluding from good cause to quit "situations where an employee experiences irreconcilable differences with others at work, or where the employee is simply frustrated or dissatisfied with his working conditions"). On the facts determined by the ULJ, which find substantial support in the record, the final incident was not a good cause for quitting.

**Affirmed**.