*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-1486**

Mary D. Isaacson,
Relator,

vs.

The Anthem Companies, Inc.,
Respondent,

Department of Employment and Economic Development,
Respondent.

**Filed July 27, 2015
Affirmed
Hooten, Judge**

Department of Employment and Economic Development
File No. 32321052-3

Thomas Klosowski, Minneapolis, Minnesota (for relator)

The Anthem Companies, Inc., St. Louis, Missouri (respondent employer)

Lee B. Nelson, Munazza Humayun, Department of Employment and Economic Development, St. Paul, Minnesota (for respondent department)

Considered and decided by Halbrooks, Presiding Judge; Schellhas, Judge; and Hooten, Judge.

UNPUBLISHED OPINION

**HOOTEN**, Judge

Relator challenges the decision of the unemployment law judge that she is ineligible for unemployment benefits, arguing that she had a good reason to quit caused by the employer because she was demoted and her job responsibilities were changed. We affirm.

## FACTS

On September 10, 2012, WellPoint, a business division of respondent The Anthem Companies, Inc., hired relator Mary D. Isaacson to be its director of specialty exchanges, a product management director position. WellPoint is a health insurance company that markets and sells health insurance plans throughout the country. Isaacson has substantial experience in developing and marketing these insurance plans, and she was hired to create and market WellPoint's dental, vision, life, disability, and workers' compensation plan offerings—so-called "specialty" plans—within the confines of the Affordable Care Act. In WellPoint terminology, she would "own[] the strategy development" regarding WellPoint's specialty healthcare plans. As part of her job, Isaacson regularly met with senior management at WellPoint in order to discuss issues of strategy and policy regarding these insurance plans. Isaacson was supervised by a staff vice president for specialty product development, and he gave Isaacson positive performance reviews from the time of her hiring until June 2013.

Isaacson's former supervisor retired in June 2013, and she began reporting directly to the successor vice president. Isaacson and the new vice president soon began to

disagree over the scope of Isaacson's job responsibilities as the director of specialty product development. In October 2013, the vice president posted a job opening for a director of portfolio execution in the specialty division. This newly created position was "[r]esponsible for overseeing the planning and execution" of the specialty plans at WellPoint, was a managerial-level position, as opposed to the exempt-level position Isaacson held, and came with greater compensation than Isaacson's position. The vice president admitted that his intention in creating this position was to take the role of strategy development for specialty healthcare reform away from Isaacson and give it to a new hire. This new position would also change the reporting structure for Isaacson, as she would now be directly reporting to the new hire. A product specialist who previously reported to Isaacson would also report to the new hire.

Isaacson interviewed for the new position, but was not selected. The vice president testified that she was the lowest-ranked applicant in the interview process. After Isaacson was not hired for the new position, she retained her current position but no longer developed strategy. Instead, she was more narrowly tasked with developing WellPoint's specialty insurance products. Isaacson's yearly salary, benefits, and work hours remained the same. Isaacson, however, claimed that she was not qualified for the "new" position she now held because she lacked the technical skills required to directly oversee the execution of these insurance plans. The vice president disputed this claim and believed that Isaacson would simply be carrying over the responsibilities and experience that she had regarding insurance product design.

In January 2014, Isaacson received a "mixed" review of her job performance from the vice president. He gave her a satisfactory ranking on the technical aspects of her position, but gave her a "mixed result" regarding her collaboration and communication within WellPoint. Isaacson was upset about this performance review, as she believed that the vice president, who had been her direct supervisor for only six months at that point, had selectively chosen negative feedback focused on Isaacson's mannerisms at meetings and had ignored the fact that she had met her performance goals and had received past positive reviews from prior supervisors. Isaacson sent a complaint to human resources in late January regarding this performance review, as well as the conflict between her job and the newly created position. After meeting with a human resources director, Isaacson succeeded in having the vice president "soften" the language within the review.

The new director of portfolio execution started working in mid-February. On February 17, Isaacson sent another complaint to human resources, alleging age discrimination demonstrated by the creation of the new position and the negative performance review she received. On February 18, Isaacson submitted a formal notice of resignation, which took effect on March 3.

Isaacson then applied for unemployment benefits, and respondent Department of Employment and Economic Development deemed her to be ineligible for benefits because she quit her job. She appealed the determination of ineligibility, and two different unemployment law judges (ULJs) held three telephonic hearings on April 25, May 21, and June 6, 2014. Isaacson and her former supervisor testified on her behalf,

while the vice president and a WellPoint human resources director testified on behalf of the employer.

In his order denying unemployment benefits, the ULJ determined that Isaacson quit because of the changes to her position and that these changes were attributable to WellPoint and personally adverse to her. However, the ULJ also determined that these circumstances were insufficient to cause an average, reasonable worker to quit and become unemployed, and he therefore found Isaacson ineligible for benefits. Isaacson requested reconsideration and the ULJ affirmed his decision, reiterating that Isaacson had not experienced changes to her job that were significant enough to cause an average, reasonable worker to quit. The matter comes before this court on a writ of certiorari by Isaacson.

## D E C I S I O N

On appeal, Isaacson argues that the ULJ erred as a matter of law by determining that she did not have a good reason to quit caused by WellPoint. We review a ULJ's decision to determine whether a relator's substantial rights have been prejudiced by legal errors, findings and conclusions not supported by substantial evidence, or a decision that is arbitrary and capricious. Minn. Stat. § 268.105, subd. 7(d)(4)–(6) (2014). We review the ULJ's findings of fact in the light most favorable to the decision and give deference to its credibility decisions. *Skarhus v. Davanni's Inc.*, 721 N.W.2d 340, 344 (Minn. App. 2006). However, credibility determinations must be supported by substantial evidence and the ULJ must set forth a valid reason for crediting or discrediting testimony that may significantly affect the ultimate decision of the ULJ. Minn. Stat. § 268.105, subd. 1a(a)

5

(2014); *see Ywswf v. Teleplan Wireless Servs., Inc.*, 726 N.W.2d 525, 533 (Minn. App. 2007).

As conceded by the parties and found by the ULJ, Isaacson quit her position with WellPoint and then applied for unemployment benefits. An unemployment-benefit applicant who quits his or her job is ineligible for benefits unless he or she falls under a statutory exception. Minn. Stat. § 268.095, subd. 1 (2014). An applicant who quits his or her job can receive benefits if he or she "quit the employment because of a good reason caused by the employer." *Id.*, subd. 1(1). The statute defines "[a] good reason caused by the employer for quitting" as a reason: "(1) that is directly related to the employment and for which the employer is responsible; (2) that is adverse to the worker; and (3) that would compel an average, reasonable worker to quit and become unemployed rather than remaining in the employment." *Id.*, subd. 3(a) (2014). While the applicant's reason for quitting is a question of fact, *see Beyer v. Heavy Duty Air, Inc.*, 393 N.W.2d 380, 382 (Minn. App. 1986), whether that reason constituted good cause to quit is a question of law that we review de novo, *Rowan v. Dream It, Inc.*, 812 N.W.2d 879, 883 (Minn. App. 2012).

The only dispute between the parties on appeal is whether the circumstances surrounding Isaacson's employment with WellPoint were sufficient, as a matter of law, to have caused an average, reasonable employee to quit. "The standard of what constitutes good cause is the standard of reasonableness as applied to the average man or woman, and not to the supersensitive . . . ." *Ferguson v. Dep't of Emp't Servs.*, 311 Minn. 34, 44 n.5, 247 N.W.2d 895, 900 n.5 (1976) (quotation omitted). This is a fact-specific analysis,

6

Minn. Stat. § 268.095, subd. 3(b), and circumstances relevant to the reasonableness of the employee's choice to quit "include loss of wages, the extent of the change of job duties, the reasonable career expectancies of the employee because of his tenure with this or other employers, and the employee's remaining chances for advancement after the demotion," *Cook v. Playworks*, 541 N.W.2d 366, 369 (Minn. App. 1996). "[T]he circumstances which compel the decision to leave employment must be real, not imaginary, substantial[,] not trifling, and reasonable, not whimsical; there must be some compulsion produced by extraneous and necessitous circumstances." *Ferguson*, 311 Minn. at 44 n.5, 247 N.W.2d at 900 n.5 (quotation omitted).

Here, the ULJ found that Isaacson quit her job due to the changes in her position at WellPoint and determined that these changes were attributable to the actions of WellPoint and were personally adverse to Isaacson "because they reduced her responsibility and visibility within the organization," thereby finding that the first two elements of "good cause" under section 268.095, subd. 3(a), were met. But, the ULJ then determined that, while "[t]hese circumstances might . . . cause an average, reasonable worker to consider other job opportunities within and outside of the company," the circumstances were insufficient to cause an average, reasonable worker to altogether quit employment because Isaacson retained the same salary and continued to perform work that she had already been performing in her position. The ULJ also rejected Isaacson's claim that she was unable to perform her new responsibilities, instead finding more credible the testimony of WellPoint representatives that these responsibilities were fully in line with the duties Isaacson had already been performing as a product management director. In

7

his order after Isaacson's request for reconsideration, the ULJ further found that Isaacson's concerns regarding career advancement opportunities and loss of earning potential were not credible and there was no "specific evidence . . . offered to show the alleged negative impact" stemming from the change in her job duties.

Isaacson challenges the ULJ's analysis, arguing that the change in her job responsibilities at WellPoint was a significant "demotion" that would have compelled an average, reasonable employee in her position to quit and that she therefore had good cause to quit under section 268.095, subd. 3(a). She primarily argues that she was given "substantially less responsibility [than] what she had originally accepted employment for" and that this reduction in her substantive responsibilities would, as a matter of common sense, adversely affect her future career opportunities and potential for future salary increases. She further claims that the ULJ wrongly focused on the fact that her salary remained the same and that she could perform her new job responsibilities, and that the ULJ incorrectly required specific evidence of the effect her "demotion" would have on her future career opportunities and pay.

However, the circumstances of Isaacson's change in job responsibilities simply were not significant enough to have warranted an average, reasonable employee to altogether quit employment. First, Isaacson not only retained the same salary, but also maintained the same benefits package, job title, and job classification within WellPoint. Also, as found by the ULJ and supported by the record, Isaacson's "new" duties were consistent with her responsibilities prior to the restructuring of her position. Essentially, the only adverse effect suffered by Isaacson was her loss of "responsibility and visibility

within the organization" when she was stripped of her higher-level strategic planning functions and access to senior management.

Isaacson argues that this "demotion" constituted good cause to quit by relying on two cases in which employees were deemed to have good cause to quit: *Marty v. Digital Equip. Corp.*, 345 N.W.2d 773 (Minn. 1984), and *Holbrook v. Minn. Museum of Art*, 405 N.W.2d 537 (Minn. App. 1987), *review denied* (Minn. July 15, 1987). In *Marty*, the employee was deemed eligible for unemployment benefits when she was terminated and then offered a new position in the company that, while having the same initial salary, had a lower maximum potential salary and required substantially less skill than her prior position because the new position involved mostly clerical work. *See* 345 N.W.2d at 774–75. Similarly, in *Holbrook*, an assistant museum curator had good reason to quit when her position was eliminated and she was then offered two half-time positions involving primarily clerical work for which she was "clearly overqualified," despite the fact that her pay would not be reduced. *See* 405 N.W.2d at 538–39.

Based on this caselaw, Isaacson is correct that the lack of change in her salary, by itself, is not determinative of whether an average, reasonable employee would have been compelled to quit in her situation. However, the facts of these two cases are otherwise distinguishable from the circumstances here. In both *Marty* and *Holbrook*, employees were removed from positions that involved work suitable to their qualifications—human resources tasks in *Marty* and art research and documentation in *Holbrook*—and then offered replacement jobs that were primarily clerical in nature. *Marty*, 345 N.W.2d at 774–75; *Holbrook*, 405 N.W.2d at 538. In each case, the employee had "a right to reject,

9

without loss of benefits, a job which require[d] substantially less skill" than the employee possessed. *Holbrook*, 405 N.W. 2d at 538 (quoting *Marty*, 345 N.W.2d at 775). Here, Isaacson was not wholly stripped of the substance of her position and relegated to clerical work; rather, her job became more narrowly focused on designing insurance products, consistent with much of the work she had previously performed at WellPoint and with other past employers. "[T]he extent of the change of job duties" in this case is simply not as extensive as the reassignments in *Marty* or *Holbrook*. *See Cook*, 541 N.W.2d at 369,

Isaacson further argues that this court should recognize that "demotion" is "universally recognized" as detrimental to her future career prospects, and that to require her to produce specific evidence of such detriment would be inconsistent with the unemployment-benefit scheme and caselaw. Under *Cook*, we are to consider "reasonable career expectancies of the employee" and "the employee's remaining chances for advancement after the demotion" in evaluating whether good cause exists. 541 N.W.2d at 369.

However, neither *Marty* nor *Holbrook* relied on abstractions of future detriment in concluding that good cause to quit existed; rather, the record produced in both of those cases showed that the replacement positions offered to those relators entailed a significant reduction in salary potential from their prior positions. *See Marty*, 345 N.W.2d at 775 ("[T]he difference in salary potential between the two positions was 10.6%."); *Holbrook*, 405 N.W.2d at 539 ("[T]here was evidence that the pay scales for [the new] positions were lower than the pay scale for her assistant curator position."). Here, Isaacson did not raise such concrete concerns about her salary potential. Isaacson testified that her rate of

10

pay did not change and that she was unsure whether her eligibility for performance bonuses was affected.

Isaacson's concerns about the advancement of her career are similarly tenuous. At the hearing in this case, Isaacson claimed that the fact that she no longer regularly met with senior management at WellPoint "diminished" her role such that "get[ting] an equal position outside of WellPoint [would be] very challenging." But, the ULJ found that this claim was "not credible because it constitutes only speculation," as she offered "no specific evidence . . . to show the alleged negative impact" of the shift in her job responsibilities upon her career prospects. Our review of the record substantiates the ULJ's findings. Coupled with the fact that her job duties were not extensively changed, these concerns, while valid, do not rise to a level that "would compel the average, reasonable worker to quit." Minn. Stat. § 268.095, subd. 3(a)(3).

We conclude that Isaacson lacked good reason to quit because an average, reasonable employee under these circumstances would not have quit and become unemployed.

**Affirmed.**