# Gloria Porter v. Department of Employment Security

[430 A.2d 450]

No. 368-78

Present: Larrow, Billings, Hill and Underwood, JJ., and
Daley, J. (Ret.), Specially Assigned

Opinion Filed April 7, 1981

*David M. Gearin* of *Latham, Eastman, Schweyer & Tetzlaff*, Burlington, for Plaintiff.

*Michael B. Clapp* of *Dinse, Allen & Erdmann*, Burlington, for Defendant.

Underwood, J. Gloria Porter had been employed at the Medical Center Hospital of Vermont in Burlington as a registered nurse for over two years. On June 15, 1978, she came on duty at 3:30 P.M. on Patrick 4 (the neurosurgery floor) as the nurse in charge on that floor for the evening shift. It was her duty to check on each patient and to administer the 4:00 P.M. medications. Patrick 4 was at capacity that afternoon, with 24 patients, and was a very active unit.

During the course of her rounds, nurse Porter noticed that the nurse in charge of the previous shift had neglected a doctor's order to administer a certain medication at 12:30 P.M. to a patient suffering from a brain tumor. The medication ordered was Decadron, to be administered by the intravenous (IV) drip method starting immediately at 12:30 P.M.

Nurse Porter was concerned because 3 hours had elapsed without anyone having followed the doctor's order. She knew that the doctor had ordered Decadron for this patient in order to reduce the swelling in the brain and perhaps bring the patient out of a coma. She was faced with a dilemma which was not of her own making. The day shift had already started

an antibiotic medication on the patient using the same equipment nurse Porter would need if she were to administer the Decadron by the IV drip method. The antibiotic medication was running very slowly, and there were 100 ccs left in the drip chamber of this IV equipment.

By 4:30 P.M., nurse Porter felt that the patient's best interest required immediate administration of the prescribed medication. As there was no doctor on Patrick 4 at that time and there were still 50 ccs of the antibiotic medication left in the drip chamber of the IV equipment, she improvised so as to simulate the IV drip method as closely as possible. She injected the Decadron by the IV push method into the main IV line which was already in place so that the Decadron was diluted with the approximately 50 ccs of fluid being carried in the main IV line by the drip method. Sixty ccs of Decadron were administered by her to the patient over the next 10–15 minutes while she monitored the patient for any untoward effects. She was assisted in the administration of the medication and the observations of the patient by a licensed practical nurse.

The patient suffered no adverse effects, and nurse Porter's conduct was later condoned by two doctors, a pharmacist and a resident physician. The patient's own doctor, a neurologist, stated: "It is my neurological opinion, that in this patient, the intravenous injection did not constitute a hazard to the patient. This route of administration is fairly standard and is rarely associated with problems."

The hospital's nursing service policy is set forth in a large manual kept at the nurses' station on Patrick 4. Under the section of the manual entitled "Administration of Medications" appears the following:

> Definition: An IV push medication is any medication administered in less than 25 cc of fluid over the period of 5 minutes or less. An IV drip medication is anything over this quantity.

The Vermont Employment Security Board found that nurse Porter honestly believed that the nurse's manual authorized her to administer Decadron by the IV push method, in spite of the doubt expressed by the attending licensed practical nurse. After she had given the patient the 60 ccs of Decadron she

checked the manual and found that she had been mistaken. The manual did not authorize a registered nurse to administer Decadron by the IV push method without a specific order from a doctor. It was then that she sought advice from the doctors, a resident and a pharmacist, each of whom informed her that the procedure she had followed was acceptable and that she had not endangered the patient by doing so.

In what may have been an attempt by nurse Porter to cover for the day shift's oversight, she charted the administration of the Decadron on the patient's record as if it had been administered by the IV drip method pursuant to the doctor's order to the day shift staff. The licensed practical nurse assisting her immediately reported the incident to the nursing supervisor. That same evening, at the suggestion of the nursing supervisor, nurse Porter filed a medication error report setting forth that she had in fact administered the Decadron by the IV push method rather than by the IV drip method. She signed this report, as did the nursing supervisor, and two doctors countersigned the report.

Nurse Porter's employment was terminated, and she filed a claim for unemployment benefits. The claims examiner denied her benefits and she appealed. The appeals referee concluded that she had been discharged by her employer "for gross misconduct connected with her work" which constituted "a substantial disregard of the employer's business interests [and] gross misconduct within the meaning of the Unemployment Compensation Laws." He sustained the decision of the claims examiner and she again appealed, this time to the Vermont Employment Security Board.

The Board concluded that she was discharged by her employer for misconduct, rather than gross misconduct, connected with her work. It determined that she was disqualified for unemployment benefits on the ground that her misconduct demonstrated a substantial, culpably negligent disregard of her employer's business interests. It is from this decision that she appeals to this Court.

Pursuant to V.R.A.P. 13(d), the Employment Security Board certified the following three questions for review:

1. Whether the Board erred by failing to find that claimant administered the medication in question con-

sistently with the definitions contained in the employer's nursing policy.

2. Whether the Board's conclusion that the claimant's conduct demonstrated a substantial, culpably negligent disregard of the employer's business interests is supported by the record in light of the Board's finding that claimant acted in what she thought was the best interest of the patient.

3. Whether the Board properly construed the conduct complained of as a series of acts of misconduct.

We will address these questions in order.

■ Appellant argues that she did not contravene the hospital's policy when she administered the Decadron into the main line of the IV drip equipment. She points to the hospital's definition of the IV push method to support her position. The method she used was to introduce 60 ccs of Decadron, over a period of 10–15 minutes, into the fluid in the main line of the IV equipment. The Decadron was thereby diluted by the 50 ccs of fluid already in the drip equipment. Such a procedure, she insists, does not place it in the category of the IV push method as defined in the manual. She contends that she was only trying to simulate the IV drip method, and succeeded, and denies that she was using the IV push method.

This is fallacious reasoning. She admitted that there was a three-way stop cock in the main IV line and also a diaphragm into which one could inject needles and pull them out without causing leakage. It was at this point that she inserted the needle carrying the Decadron medication. By turning the stop cock both medications, the antibiotic left in the chamber of the drip equipment and the Decadron, could be injected directly into the main IV line and ultimately enter the patient's vein in his arm.

The Board had ample evidence to support its findings that nurse Porter used the IV push method to administer the Decadron rather than the IV drip method as ordered by the doctor. The first certified question is therefore answered in the negative.

The crucial question is whether nurse Porter's conduct in administering the medication in the manner that she did, and under the circumstances then existing, warranted the Board

in concluding that her conduct "demonstrated a substantial, culpably negligent disregard of the employer's business interest" so as to disqualify her for benefits under the unemployment compensation law. 21 V.S.A. § 1344, in pertinent part, reads:

> (a) An individual shall be disqualified for benefits:
> (1) When he has been discharged by his last employing unit for misconduct connected with his work, . . . .

 Where misconduct of the employee is asserted as a basis for disqualification for unemployment benefits, the burden of proof is on the employer. *Cooley* v. *Department of Employment Security*, 138 Vt. 211, 212, 414 A.2d 1154, 1155 (1980); *Longe* v. *Department of Employment Security*, 135 Vt. 460, 461, 380 A.2d 76, 78–79 (1977).

 The propriety of her discharge from employment by the hospital is not called into question by these proceedings. The Board, however, seems to equate conduct which may be reason for an employer to discharge an employee with the "misconduct" required under the statute, to support the Board's conclusions that the employee is disqualified for unemployment benefits.

> Although the employer's determination, that, as to that employer, the conduct is considered misconduct, may be evidence relevant to the issue before the commissioner, it is not *per se* controlling. The statute calls for a separate evaluation by the commissioner, and that evaluation should be carried out in the light of the remedial and beneficial purposes of the unemployment compensation act, rather than on the basis of internal hiring procedures adopted by employers. (Citation omitted.)

*In re Gray*, 127 Vt. 303, 305, 248 A.2d 693, 695 (1968). See also *Johnson* v. *Department of Employment Security*, 138 Vt. 554, 556, 420 A.2d 106, 107 (1980). Disqualifying misconduct involves "substantial disregard of the employer's interest, either wilful or culpably negligent." *Id.* at 555, 420 A.2d at 107. We must examine the record to ascertain whether nurse Porter's conduct reached that degree.

The Board found:

12. At the time she administered the Decadron, the claimant had no intention of violating the employer's nursing policy. She acted in what she thought was the best interest of the patient since she understood that the effect of Decadron was to relieve pressure on the patient's brain and was aware of the patient's brain tumor.

. . . .

15. There is no evidence that the patient suffered any adverse effects from the claimant's administration of the medication by push instead of soluset.

Culpable negligence is defined as "Failure to exercise that degree of care rendered appropriate by the particular circumstances, and which a man of ordinary prudence in the same situation and with equal experience would not have omitted." Black's Law Dictionary 931 (5th ed. 1979). "Substantial" connotes "important" or "considerable." Substantial culpable negligence is therefore something more than mere negligence. Wilful negligence is defined as "[A]n act of an unreasonable character [intentionally done] in disregard of a risk known to him or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow." *Id.* at 932.

The term "misconduct" as used in unemployment compensation law connotes an "act or course of conduct in violation of the employee's duties, which is tantamount to an intentional disregard of the employer's interest." 1B Unempl. Ins. Rep. (CCH 1980) Vt. ¶ 8146 (Misconduct—DES Policy Statement). Mere mistakes, errors in judgment, unintentional carelessness or negligence are not acts of misconduct sufficient to disqualify a claimant for unemployment benefits, though they may very well be acts of misconduct warranting discharge of the employee.

As indicated in its finding No. 12, the Board did not find the wilful disregard of the employer's interest which is required to substantiate a conclusion of misconduct sufficient for the imposition of the statutory penalty. The Board's findings, and the necessary inferences to be taken from them, clearly support the proposition that the actions of the claimant were taken in good faith. So taken, they evidence responsible

action on the part of the claimant in the best interest of her patient and, a fortiori, her employer. *Kuhn v. Department of Employment Security,* 134 Vt. 292, 295, 357 A.2d 534, 535–36 (1976). The findings do not support the Board's conclusions and determination that the claimant's conduct was substantially wilful or amounted to a substantial culpably negligent disregard of her employer's business interest. "In respect to this particular statute, it is to be remembered that the Unemployment Compensation Act, as remedial legislation, is to be interpreted in line with its benevolent objectives, and therefore no claimant should be excluded from its provisions unless the law clearly intends such an exclusion." *Nolan v. Davidson,* 134 Vt. 295, 298, 357 A.2d 129, 131 (1976). See also *Jenkins v. Department of Employment Security,* 135 Vt. 210, 212, 373 A.2d 533, 534 (1977). The Act must be applied in a manner consistent with the stated purpose of removing the economic disabilities and distress resulting from involuntary unemployment. *In re Platt,* 130 Vt. 329, 331, 292 A.2d 822, 824 (1972). The second certified question is therefore answered in the negative.

The Board's conclusions state, in part, as follows:

> Although it appears that this was an isolated incident of misconduct, it essentially involved three elements, the claimant's decision to use the push method; her failure to confirm the propriety of this method by examining nursing policy or inquiring of a physician; and her inaccurate entry in the patient's records, all of which, taken together, amounted to a series of acts of misconduct closely related in time.

Not one of these elements in and of itself would support a finding of substantial wilful or culpable negligence. Furthermore, to denominate these three elements, which all occurred within a space of some 15 minutes, as three separate acts of misconduct is to embroider upon the facts. There is no support for the conclusion that the three nearly simultaneous elements of nurse Porter's misconduct elevated this negligence to a state of wilful or culpable negligence. Whether taken individually or collectively, the actions of nurse Porter demonstrate

neither a wilful nor an intentional act. The third certified question is therefore also answered in the negative.

*Reversed and remanded for the computation of benefits.*