**Randy W. RESS, Relator,**

v.

**ABBOTT NORTHWESTERN HOSPITAL, INC., Commissioner of Jobs and Training, Respondents.**

No. C8–88–2208.

Court of Appeals of Minnesota.

April 25, 1989.

Review Granted June 21, 1989.

Daniel J. Sheran, Lindquist & Vennum, Minneapolis, for Randy W. Ress, relator.

Robert S. Halagan, Falhaber, Larson, Fenlon and Vogt, Minneapolis, for Abbott Northwestern Hospital, Inc., respondent.

Hubert H. Humphrey, III, Atty. Gen. and Donald E. Notvik, Asst. Atty. Gen., St. Paul, for Commissioner of Jobs and Training, respondent.

Considered and decided by CRIPPEN, P.J., and HUSPENI and IRVINE, JJ., without oral argument.

## OPINION

L.J. IRVINE, Judge *.

Relator, a registered nurse, seeks review of a decision by the Department of Jobs and Training denying him unemployment compensation benefits. Relator argues that his actions constituted a good faith response to a situation involving the best interests of a hospital patient, and should not be characterized as misconduct. We agree and reverse.

## FACTS

Relator Randy Ress worked for the respondent Abbott Northwestern Hospital as a registered nurse for approximately eight years. Ress was discharged from his position on the hospital's cardiac care unit following an incident on January 21, 1988 when he allegedly initiated a course of treatment that was potentially dangerous to a patient and outside the scope of his license.

Upon his discharge, Ress applied for unemployment compensation benefits, claiming he had responded to an emergency situation in an appropriate manner. A claims adjudicator with the Department of Jobs and Training disallowed Ress' claim, and Ress appealed to a Department referee, who conducted a hearing.

The evidence revealed that on the evening of January 21, Ress was the primary care nurse for a patient who was attached to a ventilator by means of an endotracheal tube. A pulmonary artery catheter was monitoring the patient's heart.

At approximately 10:40 p.m., the patient began bleeding profusely from the endotracheal tube. Ress called for help, disconnected the endotracheal tube, and began suctioning the bloody fluid from the tube.

Shortly thereafter, a first-year resident arrived on the scene.

The resident did not testify at the hearing before the referee, but his written statement was submitted into evidence. According to the resident, when he entered the patient's room he "suggested" to the nurses present that an attempt be made to pull back the endotracheal tube slightly. In response, Ress stated that the patient was very difficult to intubate, and that the endotracheal tube should not be touched. The resident indicated that at a later point, he again suggested adjusting the endotracheal tube, but Ress again disagreed with the suggestion.

Ress suggested administering epinephrine [1] to the patient, but the resident suggested using vasopressin [2] instead. Ress stated that he was not sure vasopressin was available on the unit. Ress ordered another nurse to get the epinephrine, and the resident did not object.

Under Ress' direction, another nurse poured sterile saline solution over ice, rendering the solution unsterile, and then administered small doses of the iced saline solution into the endotracheal tube while Ress continued suctioning.

The evidence indicated that there are no nursing, medical or hospital procedures for lavaging an endotracheal tube with iced nonsterile saline solution; however, lavage with normal saline solution may be appropriate under some circumstances.

The resident did not object to the lavaging procedure, but left the room to consult with a second-year resident. By 11:00 p.m. when the resident returned, the bleeding had stopped, and Ress had discontinued the lavaging procedure. At that point, the resident told Ress to order a chest x-ray, but Ress replied that the patient's family wanted to visit, and he would order the x-ray after they had visited. Ress testified that he ordered the x-ray shortly thereafter, and

---

* Acting as judge of the Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 2.

1. Epinephrine is a hormone which produces cardiac stimulation, constriction or dilation of blood vessels and bronchialor relaxation. Sted-

man's Medical Dictionary Unabridged Lawyers Ed. (1966).

2. Vasopressin is a blood pressure raising hormone. *Id.*

the x-ray was completed around midnight. Ress began paging the resident immediately, but received no response from the resident. The x-ray was apparently not interpreted until noon the next day.

The referee determined that while Ress may have exercised poor judgment or acted negligently, his actions did not constitute misconduct. In a memorandum, the referee found that the resident offered Ress no direction and, by his silence, acquiesced in Ress' actions. The referee noted that Ress did not refuse to comply with the x-ray order; he simply wanted to wait until the patient's family had visited.

The hospital appealed to a Commissioner's representative, who reversed the referee's decision. In a memorandum, the Commissioner's representative found that Ress had refused the resident's suggestion to adjust the endotracheal tube; had ordered epinephrine without the resident's authorization; had instituted an unestablished lavaging procedure; and had refused to follow the resident's directive to immediately order the chest x-ray. The Commissioner's representative concluded that Ress' conduct was insubordinate and went beyond the scope of conduct contemplated by his nursing license.

Ress submitted a Request for Reconsideration of the Commissioner's decision, indicating that the Minnesota Board of Nursing had considered and dismissed a complaint by the hospital regarding his actions on the evening of January 21. A Commissioner's representative denied Ress' request for reconsideration. Ress subsequently delivered a copy of the Board's findings to the Commissioner's representative.

Ress has sought review of the Commissioner's determination, arguing that he reacted in good faith to a situation involving the well being of a patient, and did not commit misconduct for unemployment compensation purposes.

## ISSUES

1. Did the Commissioner's representative err by adopting a decision contrary to the Board of Nursing?

2. Did the Commissioner's representative err by concluding that Ress' actions constituted disqualifying misconduct for unemployment compensation purposes?

## ANALYSIS

■ 1. Ress challenges the determination of the Commissioner's representative that he acted outside the scope of his nursing license on the evening of January 21, 1988. Ress claims the Minnesota Board of Nursing declined to make such a determination, and the Commissioner's representative erred by failing to consider the Nursing Board's decision.

Ress' argument is not supported by principles of collateral estoppel, which require the following:

(1) the issue was identical to one in a prior adjudication; (2) there was a final judgment on the merits; (3) the estopped party was a party or in privity with a party to the prior adjudication; and (4) the estopped party was given a full and fair opportunity to be heard on the adjudicated issue.

*Willems v. Commissioner of Public Safety,* 333 N.W.2d 619, 621 (Minn.1983). We are unconvinced that the issues in the disciplinary action were identical to those in the present misconduct proceeding; nor does the record indicate that the hospital was allowed the opportunity during the disciplinary proceedings to present its evidence concerning Ress' conduct.

We particularly note that the Nursing Board's decision was not presented to the Commissioner's representative until after he had issued his decision denying Ress' request for reconsideration. While the Board's decision is appended to Ress' brief, it was never made a part of the record below. In *Lumpkin v. North Central Airlines, Inc.,* 296 Minn. 456, 209 N.W.2d 397 (1973) the supreme court stated:

There being no proof in the record before us as to the adjustment board's findings or the issues litigated before that board, its decision is not res judicata in the

Manpower Services hearing with which we are concerned.

*Id.* at 462–63, 209 N.W.2d at 402.

In *Whorton v. Department of Health & Human Services,* 368 N.W.2d 750 (Minn. Ct.App.1985), we upheld a decision where the Commissioner of Economic Security (now Jobs and Training) refused to be bound by an arbitrator's decision in a separate proceeding:

> The arbitration award finding for relator was provided to the Commissioner after oral argument. The Commissioner * * * chose not to be bound by the decision of the arbitrator. He determined the arbitrator's decision was based upon the terms of the collective bargaining agreement and not Minnesota unemployment services law. The Commissioner noted that exhibits, documents and testimony submitted to the arbitrator were not part of the record in the employment claim. Finally, the Commissioner held the arbitrator's decision, even if accepted into evidence under stipulation, did not have a res judicata or collateral estoppel effect.

*Id.* at 751. Similarly, we conclude in the present case the Commissioner's representative was not bound by the decision issued by the Board of Nursing.

2. Minn.Stat. § 268.09, subd. 1(b) (1988) provides that an individual who is discharged for misconduct is disqualified from receiving unemployment compensation benefits.

> * * * [T]he intended meaning of the term "misconduct" * * * is limited to conduct evincing such wilful or wanton disregard of an employer's interests as is found in deliberate violations or disregard of standards of behavior which the employer has the right to expect of his employee, or in carelessness or negligence of such degree or recurrence as to manifest equal culpability, wrongful intent or evil design, or to show an intentional and substantial disregard of the employer's interests or of the employee's duties and obligations to his employer. On the other hand mere inefficiency, unsatisfactory conduct, failure in good performance as the result of inability or

incapacity, inadvertencies or ordinary negligence in isolated instances, or good-faith errors in judgment or discretion are not to be deemed "misconduct" * * *.

*Tilseth v. Midwest Lumber Co.,* 295 Minn. 372, 374–75, 204 N.W.2d 644, 646 (1973). An employer has the burden of proving that an employee was discharged for misconduct. *Lumpkin,* 296 Minn. at 459, 209 N.W.2d at 400. On appeal we will review the findings and decision of the Commissioner's representative, and not those of the referee. *See Tester v. Jefferson Lines,* 358 N.W.2d 143, 145 (Minn.Ct.App.1984), *pet. for rev. denied* (Minn. March 13, 1985).

The Commissioner's representative found that Ress instituted an unestablished lavaging procedure; refused to adjust the patient's endotracheal tube as suggested by the resident; suggested, ordered, and administered epinephrine instead of determining whether vasopressin was available as the resident had suggested; and refused the resident's order to immediately obtain a chest x-ray. These findings are supported by evidence and testimony presented by witnesses for the hospital; therefore, we will not disturb them on appeal. *See White v. Metropolitan Medical Center,* 332 N.W. 2d 25, 26 (Minn.1983).

▪ Whether the Commissioner's findings support the conclusion that Ress' actions constituted misconduct, however, is a question of law which we may independently review. *See Colburn v. Pine Portage Madden Bros., Inc.,* 346 N.W.2d 159, 161 (Minn.1984); *Talberg v. Commissioner of Economic Security,* 370 N.W.2d 686, 688 (Minn.Ct.App.1985).

It has generally been stated that if an employer's request is reasonable, an employee's refusal to comply with that request will constitute misconduct. *See, e.g., Woodward v. Interstate Office Systems,* 379 N.W.2d 177 (Minn.Ct.App.1985) (employee failed to respond to employer's memos or meet with employer as requested); *Daniels v. Gnan Trucking,* 352 N.W. 2d 815 (Minn.Ct.App.1984) (employee deliberately refused employer's orders to unload a trailer).

Exceptions to this rule have included situations where the employee's refusal was not willful, *Abramson v. Yellow Taxi Co.,* 308 Minn. 453, 242 N.W.2d 77 (Minn.1976); where the incident involved an isolated instance, *Flannigan v. Meadow Lane Health Care Center,* 347 N.W.2d 852 (Minn.Ct. App.1985); where the employee was afraid to perform the task, which was outside the scope of his usual duties, *Enz v. Holiday Inn North,* 388 N.W.2d 756 (Minn.Ct.App. 1986); and where the employee reasonably feared for his safety, *Ferguson v. Department of Employment Services,* 311 Minn. 34, 247 N.W.2d 895 (Minn.1976). In *Christenson v. City of Albert Lea,* 409 N.W.2d 564 (Minn.Ct.App.1987), we reversed the Commissioner and remanded for additional evidence and findings on whether the employee's refusal was reasonable because she believed the employer's request would have required her to violate the law.

In *Brewington v. Administrator of Office of Employment Security,* 497 So.2d 418 (La.App.1986), the court held that a nurse's failure to immediately carry out a doctor's instructions did not constitute misconduct disqualifying the nurse from unemployment compensation benefits. While the court found that the record clearly supported findings of negligence and unsatisfactory performance, the court noted that the nurse's failure did not constitute a deliberate disregard or violation of the hospital's rules which would constitute disqualifying misconduct. The court noted that its unemployment compensation laws were to be "construed liberally and in the interest of its beneficiaries." *Id.* at 419 (citation omitted). Likewise, in Minnesota, the unemployment compensation statutes are viewed as humanitarian and are to be construed liberally in favor of allowing benefits. *See* Minn.Stat. ˋ § 268.03 (1988); *Group Health Plan, Inc. v. Lopez,* 341 N.W.2d 294, 296 (Minn.Ct.App.1983).

In *Porter v. Department of Employment Security,* 139 Vt. 405, 430 A.2d 450 (1981), a nurse administered a drug by an alternate method when she felt the patient's best interests required immediate administration of the medication and there was no doctor on the floor. The evidence indicated that the nurse honestly believed that she was authorized to administer the drug by the alternate method without authorization from a doctor. The employment security board disallowed the nurse's claim for unemployment compensation benefits, but the Vermont Supreme Court reversed, determining that the nurse had violated hospital rules in good faith and in the best interests of the patient. *Id.* at 454–55.

In *Cundiff v. Commissioner, Unemployment Compensation Board of Review,* 88 Pa.Cmwlth. 272, 489 A.2d 948 (1985), a nurse's aide had refused her supervisor's order to leave an invalid patient and feed other patients. The nurse's aide had been in the process of bathing the invalid patient who was incontinent and required extensive bathing. The Pennsylvania court stated:

> We first note that Claimant had good cause to refuse to leave the invalid patient in the tub to attend to feeding chores. If an employee has good cause for refusing to comply with a directive of the employer, the refusal does not constitute willful misconduct.

*Id.* at 950 (citation omitted).

In *Amador v. Unemployment Insurance Appeals Board,* 35 Cal.3d 671, 200 Cal.Rptr. 298, 677 P.2d 224 (1984), the California Supreme Court applied similar reasoning. There, a histotechnician [3] was discharged from her employment for willfully refusing to perform a procedure known as "grosscutting"—selection and removal of small tissue samples from large specimens removed by a doctor from a patient. The histotechnician refused to perform grosscutting on tissue from live patients because she believed the procedure exceeded her capabilities as a histotechnician. The *Amador* court concluded:

> [A] worker who has been discharged for willfully refusing to perform work which she reasonably and in good faith believed would jeopardize the health of others has not committed "misconduct" within the

---

**3.** Histotechnicians prepare tissue samples for microscopic analysis by pathologists.

meaning of [the unemployment compensation laws].

*Id.* at 231.

In the present situation, while the record supports the Commissioner's findings that Ress did not comply with the resident's suggestions and directives, the Commissioner's decision does not address Ress' claim that his actions were conducted under a good faith and reasonable belief that he was advancing the best interests of the patient. There is no evidence that Ress did not have good cause to refuse to comply with the resident's directives, and we therefore reverse the Commissioner's conclusion that Ress' refusals constituted misconduct.

## DECISION

The Commissioner's representative erred as a matter of law by concluding that Ress' actions constituted misconduct.

Reversed.

HUSPENI, Judge (dissenting).

I would affirm the Commissioner. Four actions of Ress are cited as inappropriate:

(1) Lavage of the endotracheal tube with iced non-sterile saline solution;

(2) Refusing to adjust the endotracheal tube as suggested by the resident;

(3) Suggesting, ordering, and administering epinephrine instead of determining whether vasopressin was available, as the resident had suggested; and

(4) Refusing the resident's order to immediately obtain a chest x-ray.

The first three actions were taken during an emergency. While they may have been inappropriate and negligent, I agree with the majority that in acting under emergency conditions Ress may have believed that he was saving the life of the patient. Thus, while Ress's emergency actions may have been sufficient to warrant his discharge from employment, as a matter of law they did not constitute misconduct so as to deprive him of his right to receive unemployment compensation. *See St. Williams Nursing Home v. Koep*, 369 N.W.2d 33, 34 (Minn.Ct.App.1985) (citing *Windsperger v. Broadway Liquor Outlet*,

346 N.W.2d 142, 143 (Minn.1984)); *Auger v. Gillette Co.*, 303 N.W.2d 255, 257 (Minn. 1981).

I am troubled, however, by Ress's refusal to comply with the resident's direct order to obtain an x-ray to pinpoint the source of hemorrhage. The Commissioner's categorization of that action as misconduct was, I believe, correct. At the time of the resident's order to obtain an x-ray, the immediate emergency had passed. The patient was resting quietly. In acting as he did, Ress engaged in insubordinate conduct similar to that which was determined to be disqualifying in *Woodward v. Interstate Office Systems*, 379 N.W.2d 177 (Minn.Ct. App.1985) and *Daniels v. Gnan Trucking*, 352 N.W.2d 815 (Minn.Ct.App.1984). If in fact Ress as an experienced registered nurse believed that the order of a first year resident medical doctor would unduly disturb the patient who was now at rest, Ress had alternatives other than insubordination available to him; as observed by the Commissioner, Ress could have contacted a superior physician.

Finally, I share the concern expressed by the Commissioner that the conduct of Ress was "particularly egregious in the light of this employer's business." Employee misconduct in a hospital setting may result in consequences which extend far beyond those which can be measured in economic terms.

CRIPPEN, Judge, concurring specially.

None of the judges assigned to this case finds support in the record for conclusions of the Commissioner that relator displayed willful or wanton disregard of his employer's interests in his actions preceding the request by a resident physician to obtain a chest x-ray. In my opinion, the Commissioner similarly erred regarding relator's response to the x-ray directive.

Based on ample evidence of record, the Commissioner confirmed that refusal of an instruction had occurred. By itself, that finding will not suffice to demonstrate misconduct. Was the directive material? Was the refusal material? Was the refusal unreasonable such that it showed willfulness,

either a deliberate affront to the employer's standards or such a degree of carelessness as evidences equally wrongful intent? *Tilseth v. Midwest Lumber Co.,* 295 Minn. 372, 374–75, 204 N.W.2d 644, 646 (1973).

In the case of directions of a physician, the Commissioner evidently concludes it is enough to find an instruction and a refusal, no matter what the circumstances. The Commissioner explains that "the cumulative effect of all nurses overriding physician's directives" would be "extraordinarily injurious to the employer's interests." To the contrary, we have never retreated from examining the merits of an employee's claims of excuse or justification for refusing an employer's directions. *See Daniels v. Gnan Trucking,* 352 N.W.2d 815, 816 (Minn.Ct.App.1984); *Woodward v. Interstate Office Systems,* 379 N.W.2d 177, 180 (Minn.Ct.App.1985). There are no authorities suggesting a different rule of law for medical employers. *See e.g. Cundiff v. Commissioner, Unemployment Compensation Board of Review,* 88 Pa.Commw. 272, 489 A.2d 948 (Pa.Commw.Ct.1985).

### 1.

The record here shows, as the referee found, that the physician acquiesced in relator's stance against disturbing the patient immediately to obtain an x-ray. He did nothing to contradict the nurse. He evidently left the hospital after his shift ended without taking any steps showing his interest in an early reading of an x-ray.

### 2.

There is no suggestion in the record of willfulness in the nurse's handling of the resident's request. The circumstances in which the nurse found himself were not considered by the Commissioner.

The patient's son had seen the peril of his mother, and the nurse was responsible to keep him informed about the crisis. Convinced that the patient might not live long, the nurse advised the son to contact other family members. The son and the other relatives urged that the primary medical concern should be to keep the patient comfortable. The son asked that he be permitted to see the patient when she

was comfortable, and the nurse told him this could be done.

The x-ray request came before the patient's son was at her side. The nurse ordered the x-ray soon after the son and the other family members saw the patient. Other family members reiterated their concern for the patient's comfort, and the nurse explained the need for an x-ray.

Relator explained to the resident his concern that the x-ray procedure might further imperil the patient, and that family contact was necessary while the patient was resting comfortably.

Under these circumstances, there was no evidence permitting a finding that relator handled the x-ray request with willful disregard for hospital standards. While his judgment was unsatisfactory in terms of hospital regimen, such unsatisfactory conduct does not constitute misconduct. *Tilseth,* 295 Minn. at 375, 204 N.W.2d at 646. The conclusion is especially important in light of the mandate that we construe unemployment compensation statutes liberally. *Hendrickson v. Northfield Cleaners,* 295 N.W.2d 384, 385 (Minn.1980).

### 3.

Three other observations of the Commissioner's representative require brief comment.

The representative's memorandum states that the x-ray was ordered one hour after relator was told to obtain it. This finding is not sustained by the record. Undisputed evidence shows that the x-ray was ordered and obtained by midnight, a half hour after another nurse heard the x-ray conversation between relator and the resident. Relator's narrative of events, including meetings with the family after 11:00 p.m., and before the x-ray request, corroborates the other evidence on the time of the delay.

The representative's memorandum states that the resident advised relator on the importance of obtaining an immediate x-ray. The doctor stated the purpose of an x-ray, but nothing in the record shows his comments on the medical urgency for the procedure. To the contrary, the physician's own conduct belies any implication

that time was of the essence in seeing an x-ray.

Finally, the Commissioner's representative observes that relator had a professional duty to contact a superior physician if he disagreed with the resident. Indeed, it is undisputed that relator did state a determination to contact a more senior resident then on duty. The attending resident told him this would be inappropriate.