*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-0155**

John L. Corrigan,
Relator,

vs.

North Metro Harness Initiative, LLC,
Respondent,

Department of Employment and Economic Development,
Respondent.

**Filed November 2, 2015
Affirmed
Smith, Judge**

Department of Economic and Employment Development
File No. 32894356-3

John L. Corrigan, Belfair, Washington (pro se relator)

North Metro Harness Initiative, LLC, (respondent)

Lee B. Nelson, Department of Employment and Economic Development, St. Paul, Minnesota (for respondent DEED)

Considered and decided by Smith, Presiding Judge; Peterson, Judge; and Stauber, Judge.

UNPUBLISHED OPINION

**SMITH**, Judge

We affirm the determination of the unemployment law judge (ULJ) that relator is ineligible for employment benefits because the record substantially supports the ULJ's finding that relator quit his employment without a good reason caused by the employer.

## FACTS

Relator John Corrigan was employed by respondent North Metro Harness Initiative, LLC (North Metro) as a poker dealer from March 31, 2011, to September 16, 2014. Corrigan asserts that he was discharged, and North Metro asserts that he quit. The Minnesota Department of Employment and Economic Development (DEED) determined that Corrigan was ineligible for unemployment benefits because he quit his employment and the change in conditions of his employment did not have a substantial negative effect on Corrigan that would cause the average, reasonable worker to quit. Corrigan appealed this determination, and a ULJ held an evidentiary hearing.

At the hearing, Corrigan testified that he and other dealers received a letter in late August 2014 from North Metro changing their job title and duties. The new position was titled "poker floor team member" and, in addition to dealing, required the dealers to work as floor supervisor up to one shift per week. This letter listed the floor-supervisor duties, which include rotating the dealers between tables, opening and closing games, rendering impartial decisions in the event of disagreements between the dealers and players, communicating with the shift manager, running chips and player cards to the cashier's desk or front desk, sorting and verifying decks of cards, and cleaning the card room. The

2

letter indicated that employees who failed to perform floor-supervisor duties would be discharged from the employment.

Corrigan testified that he was capable of performing the duties of floor supervisor, however "it wasn't work that he wanted to do." He felt that floor supervisor was "a more social job where [he would] have to engage with people[,] and [other] type[s] of stuff [he tries] to avoid." Corrigan testified "even dealing poker gives [him] discomfort sometimes." While other employees complained to management about the job change, Corrigan did not voice his concerns.

A week before floor-supervisor shifts were scheduled to begin, Corrigan verbally told the poker-room manager that he would not perform floor-supervisor duties. Corrigan then submitted a written notice entitled "notice of acceptance of termination." In his notice, Corrigan quoted the part of the letter sent by North Metro that indicated employees who failed to perform floor-supervisor duties would be discharged and stated this was Corrigan's acceptance of that discharge.

Corrigan worked the three or four dealing shifts he was scheduled for after his notice was submitted. On September 16, 2014, Corrigan's first scheduled floor-supervisor shift, Corrigan did not show up for work. Corrigan did not have any contact with management after this date.

Mary Manney, director of table games, participated in the hearing on behalf of North Metro. She testified that she emailed Corrigan after he submitted his notice of acceptance of termination to clarify that he had not been discharged by North Metro and that his position was still available if he was willing to perform the duties of the new

3

position. Manney and North Metro's human resource manager testified that the decision to create the new position was made to keep the company viable, try to retain employees, and keep the employees as financially whole as possible by combining two positions. Manney also testified that the language in the letter that Corrigan was quoting was standard language—all of North Metro's job descriptions state that if the employee does not perform assigned duties the employee will be discharged.

Following the hearing, the ULJ decided Corrigan was ineligible for unemployment benefits because he did not quit for a good reason caused by North Metro. Corrigan requested reconsideration. The ULJ affirmed his decision denying benefits.

## D E C I S I O N

This court may remand, reverse, or modify a ULJ's decision denying benefits when the ULJ's findings, inferences, conclusions, or decision are affected by an error of law, unsupported by substantial evidence in view of the entire record, or arbitrary or capricious. Minn. Stat. § 268.105, subd. 7(d) (2014). We view factual findings in the light most favorable to the ULJ's decision and will not disturb them "when the evidence substantially sustains them." *Skarhus v. Davanni's Inc.*, 721 N.W.2d 340, 344 (Minn. App. 2006). We give deference to the ULJ's credibility determinations. *Id.*

## I.

On appeal, Corrigan challenges the ULJ's findings that he quit the employment with North Metro and that it was not for good reason caused by North Metro. We first address whether there is substantial evidence in the record to support the ULJ's factual finding that Corrigan quit. An unemployment-benefit applicant who quits his or her job

4

is ineligible for benefits unless the quit falls under a statutory exception. Minn. Stat. § 268.095, subd. 1 (2014). "A quit from employment occurs when the decision to end the employment was, at the time the employment ended, the employee's." *Id.*, subd. 2(a) (2014). "A discharge from employment occurs when any words or actions by an employer would lead a reasonable employee to believe that the employer will no longer allow the employee to work for the employer in any capacity." *Id.*, subd. 5(a) (2014). Whether an employee quit or was discharged is a question of fact, subject to this court's deference. *Stassen v. Lone Mountain Truck Leasing, LLC*, 814 N.W.2d 25, 31 (Minn. App. 2012).

The ULJ found that Corrigan quit his employment because it was his decision to end the employment when he stopped reporting to work. The ULJ also found that North Metro's decision to tell Corrigan and his coworkers that their failure to perform their new duties would result in discharge from the employment would not lead the reasonable employee to believe they were no longer allowed to work for North Metro in any capacity. Substantial evidence in the record supports the ULJ's finding. Corrigan testified that he provided oral and written notice to North Metro that he would no longer be working for the company. He also testified he made the decision to stop reporting to work even though he was still scheduled. Further, Manney testified that North Metro specifically emailed Corrigan after he turned in his written notice to inform him he had not been discharged and that his position remained available. Therefore, the ULJ did not err by determining that Corrigan quit.

We next consider whether Corrigan quit for a good reason caused by his employer. An employee who quits for "a good reason caused by the employer" remains eligible for unemployment benefits. Minn. Stat. § 268.095, subd. 1(1). The statute defines "[a] good reason caused by the employer for quitting" as a reason: "(1) that is directly related to the employment and for which the employer is responsible; (2) that is adverse to the worker; and (3) that would compel an average, reasonable worker to quit and become unemployed rather than remaining in the employment." *Id.*, subd. 3(a) (2014). While the applicant's reason for quitting is a question of fact, *Beyer v. Heavy Duty Air, Inc.*, 393 N.W.2d 380, 381-82 (Minn. App. 1986), whether that reason constituted good cause to quit is a question of law that we review de novo, *Rowan v. Dream It, Inc.*, 812 N.W.2d 879, 883 (Minn. App. 2012).

The ULJ determined Corrigan did not quit for a good reason caused by North Metro because, although the change in Corrigan's job duties by North Metro may have been adverse to Corrigan, the changes were not so adverse that they would compel the average, reasonable worker to quit and become unemployed. Corrigan argues he quit for a good reason because the changes "significantly reduced his wages" and "significantly changed his job description and duties." We address each of these arguments in turn.

Corrigan argues he had good cause to quit when his pay was significantly reduced by 37.9%. Generally, "a substantial pay reduction gives an employee good cause for quitting." *Scott v. Photo Ctr., Inc.*, 306 Minn. 535, 536, 235 N.W.2d 616, 617 (1975); *Haugen v. Superior Dev., Inc.*, 819 N.W.2d 715, 723 (Minn. App. 2012) (noting that

"caselaw consistently establishes that a substantial wage or hours reduction is good reason to quit"). However, the evidence used by Corrigan to support this argument was not presented to or received in evidence by the ULJ at the evidentiary hearing. The only mention of a reduction in wages during the hearing was when the ULJ stated "applicant quit because he believed the pay may be less" as he summarized DEED's initial determination of ineligibility for the record. "An appellate court may not base its decisions on matters outside the record on appeal, and may not consider matters not produced and received in evidence below." *Thiele v. Stich*, 425 N.W.2d 580, 582-83 (Minn. 1988). Therefore, this argument fails because there is no evidence on which this court could base a decision that supports Corrigan's argument that he had good cause to quit because of reduced wages.

Next, Corrigan argues he had good cause to quit because his new job duties significantly changed to include rendering impartial decisions in the event of disagreements between players and other dealers, maintaining or assisting with dealer lineup and reassigning personnel as needed, communicating with the shift manager, and facilitating special events. He argues these new duties would be more stressful because, as floor supervisor, the issues and problems he would have to deal with would not be confined to just the players at his table.

> [T]he circumstances which compel the decision to leave employment must be real, not imaginary, substantial[,] not trifling, and reasonable, not whimsical; there must be some compulsion produced by extraneous and necessitous circumstances. The standard of what constitutes good cause is the standard of reasonableness as applied to the average man or woman, and not to the supersensitive[.]

7

*Ferguson v. Dep't of Emp't Servs.*, 311 Minn. 34, 44 n.5, 247 N.W.2d 895, 900 n.5 (1976) (quotation omitted).  Like the standard of the "reasonable person" in negligence and anti-discrimination laws, the standard is an objective one.  *Werner v. Med. Prof'ls LLC*, 782 N.W.2d 840, 843 (Minn. App. 2010), *review denied* (Minn. Aug. 10, 2010).

Viewed under the objective-reasonableness standard, the differences in the duties of poker dealer and floor supervisor are slight.  Like floor supervisors, poker dealers continuously interact with guests and other employees as they are dealing and are often rotated among tables, forcing them to interact with many different guests during a shift.  Poker dealers also help resolve disagreements between players and ensure gaming areas are operating efficiently and effectively.

Although floor-supervisor duties may have been more stressful for Corrigan, Corrigan testified that even dealing poker gives him discomfort at times.  This shows Corrigan's current job duties already caused him stress.  Further, dealers were not expected to perform these new duties full-time, they were only required to work as floor supervisor up to one shift per week.  Therefore, the change in duties was not significant enough to have warranted an average, reasonable employee to altogether quit the employment, and the ULJ did not err in deciding Corrigan quit his employment without a good reason caused by North Metro.

### III.

Corrigan also argues he did not receive a fair hearing because the ULJ failed to fully and clearly develop all relevant facts, including the effect the changes had on

8

Corrigan's wages, and because he "did not receive all the correspondence and/or discovery that he was entitled to." Specifically, he argues that he was unaware North Metro misstated his current pay in the documents the unemployment insurance program had gathered for the hearing because he never received these documents.

A ULJ "must exercise control over the hearing procedure in a manner that protects the parties' rights to a fair hearing." Minn. R. 3310.2921 (Supp. 2014). A hearing is generally considered fair if both parties are afforded the opportunity to give statements, examine and cross-examine witnesses, and offer and object to exhibits. *See Ywswf v. Teleplan Wireless Servs., Inc.*, 726 N.W.2d 525, 529-30 (Minn. App. 2007). A ULJ "must assist parties in the presentation of evidence" and "ensure that all relevant facts are clearly and fully developed." Minn. R. 3310.2921. However,

> [t]his is not to say a ULJ is [either of the parties'] advocate; the evidentiary hearing is a fact-gathering endeavor, Minn. Stat. § 268.105, subd. 1(b), and, like all judicial and quasi-judicial fact-gathering endeavors, it is still adversarial and requires the judicial officer to maintain neutrality to assure fairness to all parties.

*Stassen*, 814 N.W.2d at 32.

The ULJ did not fail to fully and clearly develop the record. The ULJ began the hearing by explaining the procedure and asked Corrigan if he had any questions about the procedure, to which he responded, "No." The ULJ then questioned each witness about the factual underpinnings of the case. Specifically, the ULJ asked Corrigan why he did not want to be floor supervisor, if he had any other reasons for not wanting to be a floor supervisor, and if he had anything else he wanted to add regarding his separation from

9

this employment. Not once did Corrigan state that he was concerned about a reduction in his wages. The ULJ then provided Corrigan the opportunity to ask questions of the other party, cross-examine witnesses and to provide a closing statement prior to closing the record.

Moreover, it is irrelevant whether Corrigan's pay is misstated in the documents the unemployment program had gathered because the ULJ did not consider this evidence when making his decision. *See* Minn. R. 3310.2922 (Supp. 2014) ("Only evidence received into the record of any hearing may considered by the unemployment law judge."). At the beginning of the hearing, the ULJ asked both parties if they had received the packet of information mailed to them, to which Corrigan responded, "No." Because Corrigan had not received the documents, the ULJ did not take the documents into the record.

**IV.**

Corrigan also argues that the ULJ improperly denied him an additional evidentiary hearing because an additional hearing would have allowed him the opportunity to introduce evidence that other employees had also quit their employment with North Metro due to similar changes in their job title and duties. He argues this evidence is directly related to whether he quit for a good reason caused by North Metro because it would show the average, reasonable worker would quit and become unemployed rather than remaining in the employment.

A ULJ must order an additional evidentiary hearing if the requesting party demonstrates that the new evidence would likely change the outcome and that either the

10

party had good cause for not previously submitting the evidence, or that the new evidence would show that previously admitted evidence was likely false. Minn. Stat. § 268.105, subd. 2(c) (2014). This court defers to a ULJ's decision to grant an additional evidentiary hearing and will reverse that decision only for an abuse of discretion. *Vasseei v. Schmitty & Sons Sch. Buses Inc.*, 793 N.W.2d 747, 750 (Minn. App. 2010).

Upon reconsideration, the ULJ stated Corrigan's new evidence would not change his decision because Minnesota Statute section 268.095 (2014) requires an analysis of Corrigan's reasons for leaving rather than an analysis of all of North Metro's employees. This analysis is sound. The plain language of the statute requires an analysis of Corrigan's reasons for quitting and whether North Metro treated him adversely. *See* Minn. Stat. § 268.095, subds. 1(1), 3(a)(2). It states nothing about analyzing any other employee's concerns or treatments. *See* Minn. Stat. § 268.095. Further, whether an average, reasonable worker would quit and become unemployed is not determined by the subjective beliefs of a single worker or group of workers, but from an objective analysis of the average, reasonable worker under the circumstances. *See* Minn. Stat. § 268.095, subd. 3(a)(3); *Ferguson*, 311 Minn. at 44 n.5, 247 N.W.2d at 900 n.5; *Werner*, 782 N.W.2d at 843. Therefore, the ULJ did not abuse his discretion by not holding an additional evidentiary hearing.

## V.

Lastly, Corrigan argues it was untrue that the changes made by North Metro were made in an effort to prevent layoffs and questions whether North Metro's motive for the changes was actually to defraud their employees and the unemployment-insurance

11

process. Upon reconsideration, the ULJ found North Metro was not engaging in fraud because "North Metro's witness openly admitted the business reasons why North Metro was making these changes." There is no evidence in the record contradicting North Metro's witness other than Corrigan's speculations on why North Metro made these changes. Further, Corrigan was allowed the opportunity to cross-examine North Metro's witness. Therefore, the evidence substantially supports the ULJ's finding and the ULJ did not err by finding that North Metro was not engaging in fraud.

**Affirmed.**