*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-1309**

Roger Stoltz,
Relator,

vs.

SMSC Gaming Enterprises - Mystic Lake Casino,
Respondent,

Department of Employment and Economic Development,
Respondent

**Filed June 13, 2016
Affirmed
Worke, Judge**

Department of Employment and Economic Development
File No. 33403311-3

Roger Stoltz, Hackensack, Minnesota (pro se relator)

Todd M. Roen, BlueDog, Paulson & Small, P.L.L.P., Minneapolis, Minnesota (for
respondent employer)

Lee B. Nelson, Tim Schepers, Minnesota Department of Employment & Economic
Development, St. Paul, Minnesota (for respondent department)

Considered and decided by Johnson, Presiding Judge; Worke, Judge; and

Schellhas, Judge.

**WORKE**, Judge

Relator challenges an unemployment-law judge's (ULJ) determination that he quit employment without a good reason caused by his employer or due to medical necessity. Relator also argues that he did not receive a fair hearing. We affirm.

## FACTS

From May 2013 through February 15, 2015, relator Roger Stoltz worked for respondent SMSC Gaming Enterprises-Mystic Lake Casino (the casino). On February 15, 2015, Stoltz was scheduled to fill buffet pans. During his shift, supervising chef Knan Ly confronted Stoltz about the turkey gravy at the buffet. After speaking with Ly, Stoltz gathered his possessions, returned his employee badge, left work, and drove home. The next day, Stoltz texted Ted Hanegraaf, a supervising chef, asking if he could return to work. Hanegraaf told Stoltz that his employment was terminated due to job abandonment.

Respondent Minnesota Department of Employment and Economic Development (DEED) initially found Stoltz eligible for unemployment benefits. The casino appealed, and a ULJ held a telephone hearing. Hanegraaf and Mary Pass, a human resources representative, appeared on behalf of the casino. Stoltz, his attorney, and a witness, S.U., also participated. S.U. stated that she was working at the time of the hearing, and the ULJ agreed to call her when it was her turn to testify.

Hanegraaf testified that Stoltz texted him on February 16, stating that he "screwed up," "lost it," and "was stupid and tired and overwhelmed which led to irrational

2

thinking." Stoltz asked whether he could return to work, apologize, and see if his job was "savable." Hanegraaf also testified that Ly sent him an email explaining that Stoltz stated "I quit," threw his employee badge, and left during his shift.

Stoltz testified that on February 15, Ly noticed the lack of turkey gravy and asked: "[W]hy the hell didn't you tell me about the turkey gravy[?]" Stoltz testified that Ly looked at the gravy pan, swore, and walked away. Ly returned shortly after and "huffed and kind of glared" at Stoltz, causing him to have a panic attack.

Stoltz testified that he took off his employee badge and "politely" handed it to Ly, but he denied saying "I quit." Stoltz grabbed his personal belongings because Ly instructed him to do so, removed a personal key from his employee badge, and returned his employee badge and uniform. Stoltz was shaking after he left, and drove 30 minutes home. Stoltz met with a doctor on February 21, and the doctor concluded that Stoltz could return to work without restriction.

Stoltz also testified that he was previously in an elevator with Ly, attempting to hold the doors open. Stoltz testified that Ly slapped his hand away from the doors, but he did not report the incident. Stoltz testified that Ly called him "stinky" on numerous occasions. The name calling ended after Stoltz reported it, but Ly still acted aggressively toward him. Stoltz also described an incident, witnessed by S.U., when Ly asked him to cut a piece of meat. After Stoltz completed the task, Ly pushed him aside, grabbed his knife, and walked away. Ly returned shortly after, slamming a prime rib and his knife on the table.

Stoltz was previously diagnosed with anxiety and had anxiety attacks at work, but he did not leave. In November 2014, Stoltz told a chef that he had anxiety. Stoltz did not tell the casino that he took anxiety medication, but, due to anxiety, he asked to be moved from the carving station. The casino granted Stoltz's request.

Without hearing S.U.'s testimony, the ULJ found that Stoltz voluntarily quit his employment and did not quit due to a good reason caused by his employer or medical necessity. The ULJ found Stoltz's testimony to not be entirely credible. Stoltz filed a request for reconsideration, and the ULJ affirmed the findings and determination. Stoltz appeals by writ of certiorari.

## DECISION

We may alter a ULJ's decision if its findings, inferences, conclusion, or decision are made upon unlawful procedure, affected by error of law, unsupported by substantial evidence, or arbitrary and capricious. Minn. Stat. § 268.105, subd. 7(d)(3)–(6) (Supp. 2015).

*Quitting employment*

Stoltz argues that the ULJ erred by determining that he quit employment. Whether an employee voluntarily quit is a question of fact. *Stassen v. Lone Mountain Truck Leasing, LLC*, 814 N.W.2d 25, 31 (Minn. App. 2012). We view a ULJ's factual findings in the light most favorable to the decision, and give deference to the ULJ's credibility determinations. *Skarhus v. Davanni's Inc.*, 721 N.W.2d 340, 344 (Minn. App. 2006). "A quit from employment occurs when the decision to end the employment was, at the time the employment ended, the employee's." Minn. Stat. § 268.095, subd. 2(a) (2014).

4

Here, Hanegraaf and Pass testified that Stoltz quit employment. Pass testified that Stoltz quit because he returned his employee badge and gathered his personal property before leaving. Ly informed Hanegraaf and Pass that on February 15 Stoltz said, "I quit," threw his employee badge, and left work early. Stoltz also texted Hanegraaf, stating "I screwed up," "I lost it," and "I was stupid and tired and overwhelmed which led to irrational thinking." Stoltz asked if he could return to work, apologize, and find out if his job was "savable."

Stoltz disputed the casino's version of what happened on February 15. For instance, Stoltz denied saying "I quit," and he testified that he probably would have left without his personal property if Ly had not told him to retrieve it. But the ULJ found that Stoltz's testimony "was not entirely credible." We defer to a ULJ's credibility determinations. *Skarhus*, 721 N.W.2d at 344. Therefore, substantial evidence establishes that Stoltz quit employment.

### Good reason caused by employer

Stoltz argues that the ULJ erred by determining that he quit employment without a good reason caused by his employer. Whether an employee had a good reason to quit caused by the employer is a question of law, reviewed de novo. *Rowan v. Dream It, Inc.*, 812 N.W.2d 879, 883 (Minn. App. 2012). The reason an employee quit, however, is a question of fact. *Beyer v. Heavy Duty Air, Inc.*, 393 N.W.2d 380, 382 (Minn. App. 1986). The conclusion that an employee did not have a good reason to quit must be based on factual findings supported by substantial evidence. *Nichols v. Reliant Eng'g & Mfg., Inc.*, 720 N.W.2d 590, 594 (Minn. App. 2006).

A person who quit employment is ineligible for unemployment benefits unless a statutory exception to ineligibility applies. Minn. Stat. § 268.095, subd. 1 (2014). One exception occurs when a person quit employment because of a good reason caused by the employer. *Id.*, subd. 1(1).

> A good reason caused by the employer for quitting is a reason: (1) that is directly related to the employment and for which the employer is responsible; (2) that is adverse to the worker; and (3) that would compel an average, reasonable worker to quit and become unemployed rather than remaining in the employment.

*Id.*, subd. 3(a) (2014). An employee subjected to adverse working conditions by the employer "must complain to the employer and give the employer a reasonable opportunity to correct the adverse working conditions before that may be considered a good reason caused by the employer for quitting." *Id.*, subd. 3(c) (2014).

Here, the ULJ concluded that Stoltz quit because he had a difficult relationship with Ly. The record supports this finding. Stoltz described an incident when Ly slapped his hand in an elevator and an incident when Ly "pushed" him aside. But these instances cannot constitute a good reason to quit caused by the casino because Stoltz did not complain or give the casino a reasonable opportunity to correct the situation. *See id.* (stating that an employee "must complain to the employer"). Stoltz also testified that Ly called him "stinky." But the name calling is also not a good reason because it stopped after Stoltz reported it, nearly a month before he quit.

Finally, Stoltz argues that after he reported the name calling, Ly's attitude and hostility continued. But Stoltz did not complain to the casino or provide a reasonable

opportunity to correct it. Stoltz testified that he told a chef about Ly's attitude and hostility, but the record does not indicate that the chef qualifies as an "employer." *See* Minn. Stat. § 268.035, subd. 14 (2014) (defining an employer as "any person that has had one or more employees during the current or the prior calendar year"). And Stoltz's testimony is inconclusive because he also testified that he did not report Ly's behavior.

Moreover, "[t]he standard of what constitutes good cause is the standard of reasonableness as applied to the average man or woman, and not to the supersensitive." *Ferguson v. Dep't of Emp't Servs.*, 311 Minn. 34, 44 n.5, 247 N.W.2d 895, 900 n.5 (1976). "Irreconcilable differences with an employer" and "mere dissatisfaction with working conditions" do not establish good cause to quit. *Ryks v. Nieuwsma Livestock Equip.*, 410 N.W.2d 380, 382 (Minn. App. 1987). Stoltz testified that he left work because Ly glared at him, "huffed," and swore. This conduct would not compel an average worker to quit. *See* Minn. Stat. § 268.095, subd. 3(a). Therefore, the ULJ did not err by concluding that Stoltz quit without a good reason caused by his employer.

### *Medical necessity*

The ULJ found that Stoltz did not quit due to medical necessity. This court reviews questions of law de novo, including whether an applicant for unemployment benefits falls within a statutory exception to ineligibility. *See Nichols*, 720 N.W.2d at 594–95. An applicant may be eligible for unemployment benefits if the applicant's serious illness or injury made it medically necessary to quit employment. Minn. Stat. § 268.095, subd. 1(7). This exception applies only if: (1) the applicant informs the

employer of his condition, (2) the applicant requests accommodation, and (3) the employer does not make a reasonable accommodation available. *Id.*

Here, the record does not establish that it was medically necessary for Stoltz to quit. Stoltz visited a doctor on February 21, and the doctor stated that he was able to return to work without any restrictions. Stoltz also texted Hanegraaf the day after he quit, asking if he could return to work and whether his job was "savable." It is unlikely that Stoltz's anxiety necessitated quitting employment if he was willing to return the next day to save his job. Stoltz also testified that he previously continued to work despite having panic attacks.

Moreover, even if the exception applied, the casino made reasonable accommodations. Stoltz told a chef that he had anxiety, and he asked to be moved from the carving station. The casino granted the request. The record does not establish another occasion when Stoltz asked for accommodations. In fact, Pass testified that the casino did not know that Stoltz had anxiety. Therefore, the ULJ did not err by concluding that Stoltz did not quit due to medical necessity.

*Fair hearing*

Stoltz argues that he did not receive a fair hearing because S.U. did not testify, and the ULJ did not let him ask questions. A ULJ "must exercise control over the hearing procedure in a manner that protects the parties' rights to a fair hearing," "ensure that all relevant facts are clearly and fully developed," and "assist all parties in the presentation of evidence." Minn. R. 3310.2921 (2015). The ULJ "may exclude any evidence that is . . . unduly repetitious." Minn. R. 3310.2922 (2015).

8

Stoltz first argues that he did not receive a fair hearing because S.U. did not testify. We are not persuaded. The ULJ did not contact S.U. after informing her that it would call her when it was her turn to testify. But Stoltz provided detailed testimony about the incident S.U. witnessed, and S.U.'s comment card that described the incident was introduced. Moreover, at the end of the hearing, the ULJ asked Stoltz and his attorney if they had anything to add, and they both declined.

Stoltz next argues that he did not receive a fair hearing because the ULJ did not let him ask questions at the beginning of the hearing. But Stoltz never attempted to ask questions at the beginning of the hearing. Stoltz attempted to cross-examine Hanegraaf at the end of the hearing, and the ULJ interrupted and stated that his attorney could ask questions. Stoltz testified, presented evidence, and his attorney cross-examined witnesses, presented a closing argument, and was allowed to offer and object to exhibits. A hearing is generally considered fair if the parties are allowed to give statements, cross-examine witnesses, and offer and object to exhibits. *See Ywswf v. Teleplan Wireless Servs., Inc.*, 726 N.W.2d 525, 529–30 (Minn. App. 2007). Therefore, Stoltz received a fair hearing.

**Affirmed.**